## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JONATHAN BLAUFARB, derivatively on behalf of BIOGEN INC., | Case No.: 1:24-cv-12623 |
| Plaintiffs, | |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| MICHAEL VOUNATSOS, ALISHA ALAIMO, ALFRED W. SANDROCK, JR., SAMANTHA BUDD-HAEBERLEIN, ALEXANDER J. DENNER, CAROLINE DORSA, WILLIAM A. HAWKINS, WILLIAM D. JONES, NANCY L. LEAMING, JESUS B. MANTAS, RICHARD C. MULLIGAN, ROBERT W. PANGIA, STELIOS PAPADOPOULOS, BRIAN S. POSNER, ERIC ROWINSKY, and STEPHEN A. SHERWIN, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| BIOGEN INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Jonathan Blaufarb ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Biogen Inc. ("Biogen" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Michel Vounatsos ("Vounatsos"), Alisha Alaimo ("Alaimo"), Alfred W. Sandrock, Jr. ("Sandrock"), Samantha Budd-Haeberlein ("Budd-Haeberlein"), Alexander J. Denner ("Denner"), Caroline D. Dorsa ("Dorsa"), William A. Hawkins

("Hawkins"), William D. Jones ("Jones"), Nancy L. Leaming ("Leaming"), Jesus B. Mantas ("Mantas"), Richard C. Mulligan ("Mulligan"), Robert W. Pangia ("Pangia"), Stelios Papadopoulos ("Papadopoulos"), Brian S. Posner ("Posner"), Eric K. Rowinsky ("Rowinsky"), and Stephen A. Sherwin ("Sherwin") (collectively, the "Individual Defendants," and together with Biogen, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Biogen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Vounatsos, Alaimo, Sandrock, and Budd-Haeberlein for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Biogen, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Biogen's directors and officers from October 22, 2019 and January 11, 2022, both dates inclusive (the "Relevant Period").

2.      Biogen is a global biopharmaceutical company that concentrates in researching, developing, and creating new treatments for people living with chronic, complex diseases in

countries all over the world. Among Biogen's products are innovative treatments for several chronic diseases, including Multiple Sclerosis ("MS") and Friedrich Ataxia. Additionally, Biogen "introduced the first approved treatment for SMA, co-developed treatments to address a defining pathology of Alzheimer's disease and launched the first approved treatment to target a genetic cause of ALS."

3.    Biogen operates in several countries throughout the Americas, Europe, and Asia, including, *inter alia*, Argentina, Brazil, Canada, China, Japan, and France.

4.    Previously, sales of the Company's main source of revenue came from its MS-related products. However, competition eventually emerged as generic versions of Biogen's MS-related products entered the market, diminishing sales of the Company's products and causing significant decline in Biogen products' revenue growth. To make up for the loss in sales, Biogen has turned to developing new drug products to increase revenues.

5.    To address this issue, the Company began to develop a treatment for Alzheimer's disease ("Alzheimer's"), Aduhelm (also referred to as its chemical name, aducanumab). Aduhelm worked by removing amyloid plaque, which was present on the brains of Alzheimer's patients. By removing this plaque, the Company hoped the progression of the disease would be slowed. If it were to obtain approval from the United States Food and Drug Administration ("FDA"), Aduhelm would have been the first Alzheimer's therapy of its kind, treating more than just the symptoms.

6.    In moving towards its Phase III trials to receive FDA approval, the Company conducted two identical international studies, Study 301 (also referred to as "ENGAGE") and Study 302 (also referred to as "EMERGE"), each consisting of approximately 1,600 patients. Each study was split into three groups of equal size: a placebo group, a low dose group, and a high dose group. The primary endpoint of the studies was a change in CDR-SB scores, which are measures

of cognitive and functional decline, at 18 months. While the drug was not expected to cause an improvement in patients' CDR-SB scores, or even maintain cognitive abilities, it was expected to slow cognitive and functional decline.

7.      The trials were halted early, in March 2019, when the trials hit the pre-specified "futility" analysis, which revealed the drug failed to show efficacy and it was unlikely the trials would reach their endpoints if continued to conclusion. Despite this, with no other viable options, the Company attempted to revive Aduhelm. Through data obtained between when the futility database locked and when futility was declared, Study 302 was barely statistically significant on its primary endpoint, garnering the Individual Defendants to proclaim Study 302 was successful.

8.      However, even if Study 302 could be considered "successful," Study 301 could not be. In fact, patients who were part of the high dose group in Study 301 were worse off than those who were in the placebo group. This was problematic as, when the FDA receives a new drug application with one positive and one negative study result, at best, it will request an additional trial. The Company estimated that, at that point, a new trial would require an additional three years of testing.

9.      To avoid this, 49 Biogen statisticians, under the close supervision of Defendants Budd-Haeberlein and Sandrock, were tasked with the job of combing through the Study 301 data in order to find any evidence to support Aduhelm's approval. This was eventually accomplished upon the reveal that there was an amendment to the trial protocols in March 2017. This amendment altered the maximum possible dose for patients who carried a gene, ApoE ε4 ("APOE4"), that predisposed them to Alzheimer's. APOE4 carriers composed two thirds of the study population. As such, the Individual Defendants were able to claim that Aduhelm worked as intended.

10.     Study 301 started before Study 302. As such, it was revealed that more APOE4 carriers received the greater dosage of Aduhelm than in Study 301, which accounted for the variance in the studies results.

11.     The Individual Defendants' machinations came to a head on November 6, 2020, when Defendants appeared before an FDA advisory committee in a public hearing to discuss the approval of Aduhelm. The briefing materials for the meeting were published on November 4 and included, albeit buried, a report by Tristan Massie, PhD (the "Massie Report"), the FDA's statistical reviewer for Aduhelm's application. Massie's report ran analyses and presented the data that the Individual Defendants had attempted to conceal. Further, the report showed that, counter to the Company's claims, there was no correlation between removal of amyloid plaque and clinical outcomes, there was no difference between patients who received a low dose and a high dose in Study 302, APOE4 non-carriers who received a high dose did not see a benefit in either study, and there was no correlation between the removal of plaque and clinical outcomes.

12.     As a result, the advisory committee voted 10-0 against the approval of Aduhelm. In its decision, the committee cited Massie's report, to which the committee agreed.

13.     On this news, the price of the Company's stock fell $92.64 per share, or approximately 28.2%, from a closing price of $328.90 per share on November 6, 2020, to close at $236.26 per share on November 9, 2020.

14.     Despite this, on June 7, 2021, the FDA approved Aduhelm. That same day, the Company announced that it would be pricing Aduhelm at approximately $56,000 per person, per year.

15.     The following day, the Company released a press release, as well as held an earnings call, to discuss the commercial rollout of Aduhelm. Among the statements made in the

press release and during the earnings call, the Individual Defendants were optimistic about the likelihood that Aduhelm would now receive Medicare coverage approval as a result of the FDA approval. In essence, the Individual Defendants indicated that Medicare coverage following FDA approval was "automatically presumed." These statements failed to reveal however, the unique relationship between Biogen and the FDA that led to Aduhelm's approval on an accelerated basis.

16.     The truth slowly began to emerge over the course of the Relevant Period. Among these revelations was the fact that many health experts disputed Biogen's evidence that Aduhelm was properly approved by the FDA, third-party payers announced they would not cover Aduhelm at the price of $56,000 per year, and many healthcare providers being unwilling to prescribe the treatment until they saw peer-reviewed data, regardless of price.

17.     The truth did not fully emerge until January 11, 2022, when the Centers for Medicare & Medicaid Services ("CMS") announced its draft opinion on whether Aduhelm would receive Medicare reimbursement (the "CMS Opinion"). The CMS Opinion revealed that CMS would only approve Medicare reimbursement for Aduhelm patients who were enrolled in clinical trials.

18.     On this news, the price of the Company's stock fell $16.18 per share, or approximately 6.7%, from a closing price of $241.52 per share on January 11, 2022, to close at $225.34 per share on January 12, 2022.

19.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Aduhelm studies conducted by the Company were both failures; (2) the Company reworked

the data to make it seem as if the Aduhelm studies were successful; (3) the Company used improper means and connections with the FDA to get Aduhelm approved; (4) the Company was aware of the fact Aduhelm did not work as intended and the FDA approval was the result of the Company's interference; (5) FDA approval does not automatically mean a drug will receive approval for Medicare; (6) the Company was aware that Aduhelm would have a difficult time receiving Medicare approval; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

20.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

21.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

22.     The Individual Defendants further breached their fiduciary duties by causing the Company to repurchase its own stock at artificially inflated rates. Indeed, between October 2019 and September 2021, approximately 36,130,249 shares of Biogen common stock were repurchased, costing the Company approximately ***$10.6 billion***.[1] Since the repurchased stock was only worth $225.34 per share, which was the price at close of trading on January 12, 2022, Biogen overpaid for these shares by approximately $2.4 billion.

23.     In light of the Individual Defendants' misconduct, which has subjected Biogen, its former Chief Executive Officer ("CEO"), its President, its former Chief Medical Officer ("CMO") and Executive Vice President ("EVP"), Research and Development, and its former Senior Vice

---

[1] All emphasis is added unless otherwise indicated.

President ("SVP")-Head of Neurodegeneration Development Unit to being named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the District of Massachusetts (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

24.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's former CEO, President, former CMO and EVP, Research and Development, and former SVP-Head of Neurodegeneration Development Unit in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Biogen's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

26.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

29.     Plaintiff is a current shareholder of Biogen common stock. Plaintiff has been a shareholder of Company stock in one brokerage account since at least 2020, which stock was transferred from another brokerage account where it was held since at least 2019.

**Nominal Defendant Biogen**

30.     Biogen is a Delaware corporation with its principal executive offices at 225 Blinney Street, Cambridge, Massachusetts 02142. Biogen's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BIIB."

**Defendant Vounatsos**

31.     Defendant Vounatsos previously served as CEO and director from January 2017 to November 2022. According to the proxy statement filed with the SEC dated April 28, 2023 (the "2023 Proxy Statement"), as of April 28, 2023 Defendant Vounatsos beneficially owned 67,262 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 28, 2023 was $304.23, Defendant Vounatsos owned approximately $20.5 million worth of Biogen stock as of that date.

32.     For the fiscal year ended December 31, 2019 (the "2019 Fiscal Year"), Defendant Vonatsos received $18,159,858 in total compensation from the Company. This included

$1,388,461 in salary, $12,352,030 in stock awards, $3,884,000 in non-equity incentive plan compensation, $85,667 in change in pension value and nonqualified deferred compensation earnings, and $449,700 in all other compensation. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Vounatsos received $18,659,829 in total compensation from the Company. This included $1,488,462 in salary, $13,887,064 in stock awards, $2,565,000 in non-equity incentive plan compensation, $264,358 in change in pension value and nonqualified deferred compensation earnings, and $454,945 in all other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Vounatsos received $17,689,665 in total compensation from the Company. This included $1,533,173 in salary, $14,084,314 in stock awards, $1,143,125 in non-equity incentive plan compensation, $494,290 in change in pension value and nonqualified deferred compensation earnings, and $424,290 in all other compensation. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Vounatsos received $26,625,221 in total compensation from the Company. This included $1,626,039 in salary, $15,389,732 in stock awards, $541,661 in change in pension value and nonqualified deferred compensation earnings, and $9,067,789 in all other compensation.

33.    The Company's 2023 Proxy Statement stated the following about Defendant Vounatsos:

Experience:

Mr. Vounatsos has served as our Chief Executive Officer and one of our directors since January 2017. Prior to that, from April 2016 to December 2016, Mr. Vounatsos served as our Executive Vice President, Chief Commercial Officer. Prior to joining Biogen, Mr. Vounatsos spent 20 years at Merck & Co., Inc., a pharmaceutical company, where he most recently served as President, Primary Care, Customer Business Line and Merck Customer Centricity. In this role, he led Merck's global primary care business unit, a role which encompassed Merck's cardiology-metabolic, general medicine, women's health and biosimilars groups and developed and instituted a strategic framework for enhancing the company's relationships with key constituents, including the most significant providers, payers

and retailers and the world's largest governments. Mr. Vounatsos previously held leadership positions across Europe and in China for Merck. Prior to that, Mr. Vounatsos held management positions at Ciba-Geigy, a pharmaceutical company. Mr. Vounatsos currently serves as a director of PerkinElmer, Inc., a global scientific technology and life science research company, on the advisory board of Tsinghua University School of Pharmaceutical Sciences, on the Supervisory Board of Liryc, the Electrophysiology and Heart Modeling Institute at the University of Bordeaux, as a member of the MIT Presidential CEO Advisory Board and as a member of NetZero International Leadership Counsel. Mr. Vounatsos received his C.S.C.T. certificate in Medicine from the Universite Victor Segalen, Bordeaux II, France, and his M.B.A. from the HEC School of Management in Paris.

Qualifications:

Mr. Vounatsos has significant knowledge and experience with respect to the biotechnology, healthcare and pharmaceutical industries, a comprehensive global leadership background resulting from service as an executive in the pharmaceutical industry and studied medicine and business as part of his educational background.

**Defendant Alaimo**

34.     Defendant Alaimo has served as President of the Company since 2017.

35.     The "Leadership" page of the Company's website states the following about

Defendant Alaimo:

Alisha A. Alaimo is President, Head of North America, responsible for the commercial operations in the United States and Canada and a Board Member of the Biogen Foundation. Ms. Alaimo is an accomplished global executive with extensive experience in leading strategy, sales, marketing, market access, key account management, advocacy and medical functions. Prior to joining Biogen in 2017 to lead the company's U.S. business, Ms. Alaimo spent 17 years at Novartis Pharmaceuticals in global product development, global brand strategy and regional leadership roles in Switzerland, the United Kingdom and the U.S. With increasing roles of responsibility, Ms. Alaimo focused on driving growth and people development in the company's high-profile, priority franchises including cardiovascular, metabolic, autoimmunity, rare disease, transplant and neuroscience. Ms. Alaimo started her career in commercial roles at Johnson & Johnson.

Ms. Alaimo holds a Bachelor of Science from Emory University and has completed courses at Harvard University and Tufts University in clinical pharmacology, drug development and regulation and business finance.

**Defendant Sandrock**

36.     Defendant Sandrock previously served as CMO of the Company from 2015 to January 2020, as well as EVP of Research and Development from October 2019 until December 2021. According to the proxy statement filed with the SEC dated April 29, 2022 (the "2022 Proxy Statement"), as of April 21, 2022 Defendant Sandrock beneficially owned 10,170 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 21, 2022 was $218.40, Defendant Sandrock owned approximately $2.2 million worth of Biogen stock as of that date.

37.     For the 2019 Fiscal Year, Defendant Sandrock received $5,312,565 in total compensation from the Company. This included $798,723 in salary, $3,360,682 in stock awards, $893,038 in non-equity incentive plan compensation, $78,506 in change in pension value and nonqualified deferred compensation earnings, and $181,616 in all other compensation. For the 2020 Fiscal Year, Defendant Sandrock received $6,226,969 in total compensation from the Company. This included $890,310in salary, $4,331,654 in stock awards, $719,541 in non-equity incentive plan compensation, $138,444 in change in pension value and nonqualified deferred compensation earnings, and $147,020 in all other compensation. For the 2021 Fiscal Year, Defendant Sandrock received $5,737,900 in total compensation from the Company. This included $921,621 in salary, $4,475,590 in stock awards, $193,267 in change in pension value and nonqualified deferred compensation earnings, and $147,422 in all other compensation.

**Defendant Budd-Haeberlein**

38.     Defendant Budd-Haeberlein previously served as SVP – Head of Neurodegeneration Development Unit of the Company from March 2020 until March 2023. Previously, she served as the Company's Vice President of Clinical Development from February 2015 until March 2020.

### **Defendant Denner**

39.     Defendant Denner is a former director who served on the Company's board from 2009 to June 2023. He also previously served as the Chair of the Corporate Governance Committee. According to the 2023 Proxy Statement, as of April 28, 2023 Defendant Denner beneficially owned 658,099 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 28, 2023 was $304.23, Defendant Denner owned approximately $200.2 million worth of Biogen stock as of that date.

40.     For the 2019 Fiscal year, Defendant Denner received $422,643 in total compensation from the Company. This included $142,500 in fees earned or paid in cash, $270,143 in stock awards, and $10,000 in all other compensation. For the 2020 Fiscal Year, Defendant Denner received $439,314 in total compensation from the Company. This included $155,000 in fees earned or paid in cash, $269,314 in stock awards, and $15,000 in all other compensation. For the 2021 Fiscal Year, Defendant Denner earned $425,413 in total compensation from the Company. This included $155,000 in fees earned or paid in cash and $270,413 in stock awards. For the 2022 Fiscal Year, Defendant Denner received $425,246 in compensation from the Company. This included $155,000 in fees earned or paid in cash and $270,246 in stock awards.

41.     The Company's 2023 Proxy Statement stated the following about Defendant Denner:

Experience:

Dr. Denner is a founding partner and Chief Investment Officer of Sarissa Capital Management LP, a registered investment advisor, which he founded in 2012. Sarissa Capital focuses on improving the strategies of companies to enhance stockholder value. From 2006 to 2011, Dr. Denner served as a Senior Managing Director at Icahn Capital L.P. Prior to that, he served as a portfolio manager at Viking Global Investors, a private investment fund, and Morgan Stanley Investment Management, a global asset management firm.

Qualifications:

Dr. Denner has significant experience overseeing the operations and research and development functions of healthcare companies and evaluating corporate governance matters. He also has extensive experience as an investor, particularly with respect to healthcare companies, and possesses broad healthcare industry knowledge.

**Defendant Dorsa**

42.     Defendant Dorsa has served as a Company director since January 2010. She also currently serves as the Chair of Biogen's Corporate Governance Committee and previously served as the Chair of the Audit Committee up until the 2023 Annual Meeting. According to the proxy statement filed with the SEC on April 26, 2024 (the "2024 Proxy Statement") as of April 26, 2024 Defendant Dorsa beneficially owned 24,882 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2024 was $208.90, Defendant Dorsa owned approximately $5.2 million worth of Biogen stock as of that date.

43.     For the 2019 Fiscal Year, Defendant Dorsa received $416,643 in compensation from the Company. This included $146,500 in fees earned or paid in cash and $270,143 in other compensation. For the 2020 Fiscal Year, Defendant Dorsa received $424,314 in total compensation from the Company. This included $155,000 in fees earned or paid in cash and $269,314 in stock awards. For the 2021 Fiscal Year, Defendant Dorsa received $425,413 in total compensation from the Company. This included $155,000 in fees earned or paid in cash and $270,413 in stock awards. For the 2022 Fiscal Year, Defendant Dorsa received $425,246 in compensation from the Company. This included $ 155,000 in fees earned or paid in cash and $270,246 in stock awards.

44.     The Company's 2024 Proxy Statement stated the following about Defendant Dorsa:

<u>Relevant Experience</u>:

Ms. Dorsa has deep knowledge of the pharmaceutical industry as well as significant financial and accounting expertise. Her strategic perspective on the industry enhances the Board's oversight of the company's growth initiatives and reviews of both internal development projects and external opportunities.

**<u>Defendant Hawkins</u>**

45.     Defendant Hawkins has served as a Company director since June 2019. He is also the Chair of the Audit Committee and a member of the Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 26, 2024 Defendant Hawkins beneficially owned 5,150 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2024 was $208.90, Defendant Hawkins owned approximately $1.1 million worth of Biogen stock as of that date.

46.     For the 2019 Fiscal Year, Defendant Hawkins received $330,036 in total compensation from the Company. This included $59,893 in fees earned or paid in cash and $270,143 in stock awards. For the 2020 Fiscal Year, Defendant Hawkins received $409,314 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $269,314 in stock awards. For the 2021 Fiscal Year, Defendant Hawkins received $410,413 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $270,413 in stock awards. For the 2022 Fiscal Year, Defendant Hawkins received $410,246 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $270,246 in stock awards.

47.     The Company's 2024 Proxy Statement stated the following about Defendant Hawkins:

<u>Relevant Expertise</u>:

Mr. Hawkins has significant executive and board leadership experience in the healthcare industry both domestic and international. Mr. Hawkins' unique perspective enhances the Board's oversight of the company's global strategic plans and implementation.

**Defendant Jones**

48.     Defendant Jones served as a Company director from June 2021 to June 2023. He also served as Chair of the Compensation and Management Development Committee. According to the 2023 Proxy Statement, as of April 28, 2023 Defendant Jones beneficially owned 2,145 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 28, 2023 was $304.23, Defendant Jones owned approximately $652,573 worth of Biogen stock as of that date.

49.     For the 2021 Fiscal Year, Defendant Jones received $361,567 in total compensation from the Company. This included consisting solely of $140,000 fees earned or cash paid and $270,413 in stock awards. For the 2022 Fiscal Year, Defendant Jones received $437,746 in total compensation from the Company. This included $147,500 in fees earned or paid in cash, $270,246 in stock awards, and $20,000 in other compensation.

50.     The Company's 2023 Proxy Statement stated the following about Defendant Jones:

Experience:

William Jones is the Managing Member of CityLink LLC, an investment and consulting firm. He is the former President/CEO of CityLink Investment Corporation, a commercial real estate company he formed in 1994 that earned national acclaim for developing complex private and public urban projects. He served as President/CEO of City Scene Management Company from 2001 through 2018. Prior to that, Mr. Jones served as Investment Manager of certain Prudential real estate subsidiaries and as General Manager/Senior Asset Manager overseeing more than 2 million square feet of office, retail, industrial and multi-family properties in three states. Earlier in his career, he served in San Diego city government as a City Council Member, Deputy Mayor and Chief of Staff to City Council Member Leon Williams. Mr. Jones is an independent director and board chair of certain funds managed by the Capital Group with net assets of approximately $600 billion and former chairman of the Audit and

Nominating/Governance committees. Mr. Jones is an independent director of Global Infrastructure Solutions Inc., a private global engineering and construction services company and chairs its Compensation and Organization Committee and is its Lead Valuation Director. He is a trustee of the UC San Diego Foundation Board and a member of its Investment Committee and Real Estate Advisory Council. Mr. Jones is a National Association Corporate Director Board Leadership Fellow and is listed in the 2019 NACD Directorship 100. He was honored as one of the nation's "Most Influential Black Corporate Directors" by Savoy Magazine in 2021.

Qualifications:

Mr. Jones has extensive leadership experience in business, not-for profit boards and government, and provides vital insights to our Board of Directors about governance and significant issues affecting the highly regulated life sciences industry. He brings financial, corporate governance and public policy sector expertise to our Board of Directors.

**Defendant Leaming**

51.     Defendant Leaming served as a Company director 2008 until 2022. She also served as a member of the Audit Committee. According to the 2022 Proxy Statement, as of April 21, 2022 Defendant Leaming beneficially owned 13,763 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 21, 2022 was $218.40, Defendant Leaming owned approximately $3.0 million worth of Biogen stock as of that date.

52.     For the 2019 Fiscal Year, Defendant Leaming received $421,333 in total compensation from the Company. This included $125,000 in fees earned or cash paid, $270,143 in stock awards, and $26,190 in all other compensation. For the 2020 Fiscal Year, Defendant Leaming received $437,814 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $269,314 in stock awards, and $28,500 in all other compensation. For the 2021 Fiscal Year, Defendant Leaming received $435,413 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $270,413 in stock awards, and $25,000 in all other compensation. For the 2022 Fiscal Year, Defendant Leaming received $70,000

in total compensation from the Company. This was paid entirely in $70,000 in fees earned or cash paid.

53.     The Company's proxy statement filed with the SEC on April 23, 2021 (the "2021 Proxy Statement") stated the following about Defendant Leaming:

Experience:

Ms. Leaming is an independent consultant and, prior to that, she served as the Chief Executive Officer and President of Tufts Health Plan, a provider of healthcare insurance. Ms. Leaming also served in several executive positions at Tufts Health Plan, including President, Chief Operating Officer and Chief Financial Officer.

Qualifications

Ms. Leaming has well-developed leadership skills and financial acumen and provides insights into the healthcare reimbursement and payor market, where she served for 20 years in senior operational, financial and managerial roles.

**Defendant Mantas**

54.     Defendant Mantas has served as a Company director since June 2019. He also serves as the Chair of the Compensation and Management Development Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 26, 2024 Defendant Mantas beneficially owned 6,048 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26, 2024 was $208.90, Defendant Mantas owned approximately $1.3 worth of Biogen stock as of that date.

55.     For the 2019 Fiscal Year, Defendant Mantas received $333,286 in total compensation from the Company. This included $63,143 in fees earned or cash paid and $270,143 in stock awards. For the 2020 Fiscal Year, Defendant Mantas received $409,314 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $269,314 in stock awards. For the 2021 Fiscal Year, Defendant Mantas received $409,413 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and

$270,413 in stock awards. For the 2022 Fiscal Year, Defendant Mantas received $417,746 in total compensation from the Company. This included $147,500 in fees earned or cash paid and $270,246 in stock awards.

56.     The Company's 2024 Proxy Statement stated the following about Defendant Mantas:

> Relevant Expertise:
>
> Mr. Mantas has over 30 years of experience in global business operations, information technology, data science and artificial intelligence gained through global strategy and operating management roles across Europe, North America and Latin America. His expertise enhances Board perspectives on global operating scale, business strategy, culture change, managing risks, applying technology to improve business performance, seeking diversity and developing talent and succession plans in multi-cultural environments.

**Defendant Mulligan**

57.     Defendant Mulligan served as a Company director from June 2009 to June 2023. He also served on the Compensation and Management Development Committee. According to the 2023 Proxy Statement, as of April 28, 2023 Defendant Mulligan beneficially owned 15,099 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 28, 2023 was $304.23, Defendant Mulligan owned approximately $4.6 million worth of Biogen stock as of that date.

58.     For the 2019 Fiscal Year, Defendant Mulligan received $401,393 in total compensation from the Company. This included $131,250 in fees earned or paid in cash and $270,143. For the 2020 Fiscal Year, Defendant Mulligan received $401,314 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $269,314. For the 2021 Fiscal Year, Defendant Mulligan received $410,413 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $270,413. For the 2022 Fiscal

Year, Defendant Mulligan received $410,246 in total compensation from the Company. This included $140,000 in fees earned or cash paid and $270,246 in stock awards.

59.     The Company's 2023 Proxy Statement stated the following about Defendant Mulligan:

Expertise:

Dr. Mulligan is currently the Mallinckrodt Professor of Genetics, Emeritus, at Harvard Medical School, after serving as the Mallinckrodt Professor of Genetics and Director of the Harvard Gene Therapy Initiative from 1996 to 2013. He also currently serves as the Head of SanaX, a division of the research department of Sana Biotechnology, Inc. (Sana), a biotechnology company. From March 2017 to October 2018, Dr. Mulligan served as a Portfolio Manager at Icahn Capital LP. Prior to that, Dr. Mulligan was a founding partner of Sarissa Capital Management LP, a registered investment advisor, from 2013 to 2016. Prior to Harvard, Dr. Mulligan was a Professor of Molecular Biology at the Massachusetts Institute of Technology, a member of the Whitehead Institute for Biomedical Research and the Chief Scientific Officer of Somatix Therapy Corporation, a drug discovery and development company that he founded. Dr. Mulligan was named a MacArthur Foundation Fellow in 1981.

Qualifications:

Dr. Mulligan has scientific expertise in the areas of molecular biology, genetics, gene therapy and biotechnology as well as extensive experience within the healthcare industry, including overseeing the operations and research and development of healthcare companies.

**Defendant Pangia**

60.     Defendant Pangia served as a Company director 1997 until 2021. He also served as the Chair of the Compensation and Management Development Committee. According to the 2021 Proxy Statement, as of April 5, 2021, Defendant Pangia beneficially owned 20,632 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2021 was $277.88, Defendant Pangia owned approximately $5.7 million worth of Biogen stock as of that date.

61.     For the 2019 Fiscal Year, Defendant Pangia received $497,095 in total compensation from the Company. This included $138,500 in fees earned or cash paid, $270,143 in stock awards, $63,452 in change in pension value and nonqualified deferred compensation earnings, and $25,000 in all other compensation. For the 2020 Fiscal Year, Defendant Pangia received $529,204 in total compensation from the Company. This included $155,000 in fees earned or paid in cash, $269,314 in stock awards, and $104,890 in change in pension value and nonqualified deferred compensation earnings. For the 2021 Fiscal Year, Defendant Pangia received $206,868 in total compensation from the Company. This included $65,151 in fees earned or paid in cash and $141,717 in change in pension value and nonqualified deferred compensation earnings.

62.     The Company's proxy statement filed with the SEC on April 20, 2020 stated the following about Defendant Pangia:

Experience:

Mr. Pangia served as a director of the Company from 1997 to 2003 during the period the Company was operated as IDEC Pharmaceuticals, and has served as a director since 2003 following IDEC's merger with Biogen, Inc. Mr. Pangia has been a partner in Ivy Capital Partners, LLC, the general partner of Ivy Healthcare Capital, L.P., a private equity fund specializing in healthcare investments, since 2003. From 2011 to 2016 he was also the Chief Executive Officer of Ivy Sports Medicine, LLC, a medical device company. From October 2007 to October 2009 he also served as the Chief Executive Officer of Highlands Acquisition Corp., a special purpose acquisition company. From 1996 to 2003 Mr. Pangia was self-employed as an investment banker. From 1987 to 1996 he held various senior management positions at PaineWebber, a financial services company, including Executive Vice President and Director of Investment Banking for PaineWebber Incorporated of New York, a member of the Board of Directors of PaineWebber, Inc., Chairman of PaineWebber Properties, Inc. and a member of several of PaineWebber's executive and operating committees.

Qualifications

Mr. Pangia has significant financial acumen and breadth of expertise within the healthcare industry.

**Defendant Papadopoulos**

63.     Defendant Papadopoulos served as a Company director from July 2008 to June 2023. Defendant Papadopoulos was also the Chairman of the Board from 2014 until June 2023. He was also a member of the Audit Committee and Corporate Governance Committee. According to the 2023 Proxy Statement, as of April 28, 2023 Defendant Papadopoulos beneficially owned 38,301 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 28, 2023 was $304.23, Defendant Papadopoulos owned approximately $11.7 million worth of Biogen stock as of that date.

64.     For the 2019 Fiscal Year, Defendant Papadopoulos received $725,310 in total compensation from the Company. This included $269,750 in fees earned or cash paid, $445,560 in stock awards, and $10,000 in all other compensation. For the 2020 Fiscal Year, Defendant Papadopoulos received $669,822 in total compensation from the Company. This included $215,000 in fees earned or cash paid, $444,822 in stock awards, and $10,000 in all other compensation. For the 2021 Fiscal Year, Defendant Papadopoulos received $679,873 in total compensation from the Company. This included $215,000 in fees earned or cash paid, $444,873 in stock awards, and $20,000 in all other compensation. For the 2022 Fiscal Year, Defendant Papadopoulos received $667,321 in compensation from the Company. This included $222,500 in fees earned or cash paid and $444,821 in stock awards.

65.     The Company's 2023 Proxy Statement stated the following about Defendant Papadopoulos:

Experience:

Dr. Papadopoulos serves as the Chairman of Exelixis, Inc., a drug discovery and development company that he co-founded in 1994, Regulus Therapeutics Inc., a biopharmaceutical company, and Eucrates Biomedical Acquisition Corp., a special

purpose acquisition company. Previously, he was an investment banker with Cowen & Co., LLC, a financial services company, focusing on the biotechnology and pharmaceutical sectors, from 2000 until his retirement as Vice Chairman in August 2006. Prior to joining Cowen & Co., Dr. Papadopoulos served for 13 years as an investment banker at PaineWebber, Inc., a financial services company, where he was most recently Chairman of PaineWebber Development Corp., a PaineWebber subsidiary focusing on biotechnology.

Qualifications:

Having founded multiple life sciences companies and worked as an investment banker focused on the life sciences industry, Dr. Papadopoulos brings to our Board of Directors a first-hand understanding of the demands of establishing, growing and running life sciences businesses.

**Defendant Posner**

66.     Defendant Posner served as a Company director 2008 until 2022. He also served as the Chair of the Compensation and Management Development Committee. According to the 2022 Proxy Statement, as of April 21, 2022 Defendant Posner beneficially owned 8,175 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 21, 2022 was $218.40, Defendant Posner owned approximately $1.8 million worth of Biogen stock as of that date.

67.     For the 2019 Fiscal Year, Defendant Posner received $444,643 in total compensation from the Company. This included $149,500 in fees earned or cash paid, $270,143 in stock awards, and $25,000 in all other compensation. For the 2020 Fiscal Year, Defendant Posner received $434,314 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $269,314 in stock awards, and $25,000 in all other compensation. For the 2021 Fiscal Year, Defendant Posner received $444,108 in total compensation from the Company. This included $148,695 in fees earned or paid in cash, $270,413 in stock awards, and $25,000 in all other compensation. For the 2022 Fiscal Year, Defendant Posner received $102,500

in total compensation from the Company. This included $77,500 in fees earned or cash paid and $25,000 in all other compensation.

68.    The Company's 2021 Proxy Statement stated the following about Defendant Posner:

Experience:

Mr. Posner has been a private investor since March 2008 and is the founder and Managing Partner of Point Rider Group LLC, a boutique consulting and advisory services firm that provides customized solutions to senior executives and boards of financial, bio-pharmaceutical and other services-related companies as well as strategic investors that make direct and control investments in those sectors. From 2005 to March 2008 Mr. Posner served as the President, Chief Executive Officer and co-Chief Investment Officer of ClearBridge Advisors LLC, an asset management company. Prior to that, Mr. Posner co-founded Hygrove Partners LLC, a private investment fund, in 2000 and served as its Managing Partner for five years. He served as a portfolio manager and an analyst at Fidelity Investments, a financial services company, from 1987 to 1996 and, from 1997 to 1999, at Warburg Pincus Asset Management/Credit Suisse Asset Management where he also served as co-Chief Investment Officer and Director of Research. Mr. Posner also serves as the Chairman of AQR Funds, an investment fund, and as a director of Arch Capital Group Ltd., a specialty insurance and reinsurance provider.

Qualifications

With more than 30 years of experience as a senior corporate executive, leading investment professional and director on public company and not-for-profit boards, Mr. Posner brings significant management and financial expertise, a professional investor's perspective and extensive experience in areas of corporate governance to our Board of Directors.

**Defendant Rowinsky**

69.    Defendant Rowinsky has served as a Company director since March 2010. He is also a member of the Compensation and Management Development Committee and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 26, 2024 Defendant Rowinsky beneficially owned 20,629 shares of the Company's common stock. Given that the price

per share of the Company's common stock at the close of trading on April 26, 2024 was $208.90, Defendant Rowinsky owned approximately $4.3 million worth of Biogen stock as of that date.

70.     For the 2019 Fiscal Year, Defendant Rowinsky received $411,143 in total compensation from the Company. This included $141,000 in fees earned or cash paid and $270,143 in stock awards. For the 2020 Fiscal Year, Defendant Rowinsky received $409,314 in total compensation from the Company. This included $140,000 in fees earned or cash paid and $269,314 in stock awards. For the 2021 Fiscal Year, Defendant Rowinsky received $410,413 in total compensation from the Company. This included $140,000 in fees earned or cash paid and $270,413 in stock awards. For the 2022 Fiscal Year, Defendant Rowinsky received $410,246 in total compensation from the Company. This included $140,000 in fees earned or cash paid and $270,246 in stock awards.

71.     The Company's 2024 Proxy Statement stated the following about Defendant Rowinsky:

Relevant Expertise:

Dr. Rowinsky has extensive research and drug development and regulatory experience and broad scientific and medical knowledge. His experience leading teams that have registered more than twelve novel therapies for patients with advanced cancers enhances the Board's oversight of the company's research and development (R&D) and quest to pioneer breakthrough innovations within the highly regulated life sciences industry.

**Defendant Sherwin**

72.     Defendant Sherwin has served as a Company director since March 2010. He also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 26, 2024 Defendant Sherwin beneficially owned 18,738 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 26,

2024 was $208.90, Defendant Sherwin owned approximately $3.9 million worth of Biogen stock as of that date.

73.     For the 2019 Fiscal Year, Defendant Sherwin received $411,893 in total compensation from the Company. This included $116,750 in fees earned or cash paid, $270,143 in stock awards, and $25,000 in all other compensation. For the 2020 Fiscal Year, Defendant Sherwin received $409,314 in total compensation from the Company. This included $140,000 in fees earned or cash paid and $269,314 in stock awards. For the 2021 Fiscal Year, Defendant Sherwin received $460,413 in total compensation from the Company. This included $140,000 in fees earned or cash paid, $270,413 in stock awards, and $50,000 in all other compensation. For the 2022 Fiscal Year, Defendant Sherwin received $435,246 in total compensation from the Company. This included $140,000 in fees earned or cash paid, $270,246 in stock awards, and $25,000 in all other compensation.

74.     The Company's 2024 Proxy Statement stated the following about Defendant Sherwin:

Relevant Expertise:

Dr. Sherwin has extensive knowledge of the life sciences industry through his advisory work in life sciences, and patient care and teaching in his specialty of medical oncology, as well as founding and leading life sciences companies. Dr. Sherwin's more than 30 years of industry experience significantly enhances Board oversight and development of the company's strategy and execution.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

75.     By reason of their positions as officers, directors, and/or fiduciaries of Biogen and because of their ability to control the business and corporate affairs of Biogen, the Individual Defendants owed Biogen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Biogen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to

act in furtherance of the best interests of Biogen and its shareholders so as to benefit all shareholders equally.

76.     Each director and officer of the Company owes to Biogen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

77.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Biogen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

78.     To discharge their duties, the officers and directors of Biogen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

79.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Biogen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Biogen's Board at all relevant times.

80.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

81.     To discharge their duties, the officers and directors of Biogen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Biogen were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Biogen's own Code of Business Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Biogen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Biogen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Biogen's operations would comply with all applicable laws and Biogen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

82.      Each of the Individual Defendants further owed to Biogen and the shareholders the duty of loyalty requiring that each favor Biogen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

83.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Biogen and were at all times acting within the course and scope of such agency.

84.     Because of their advisory, executive, managerial, and directorial positions with Biogen, each of the Individual Defendants had access to adverse, non-public information about the Company.

85.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Biogen.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

86.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

87.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement waste of corporate assets, abuse of control, and violations of Section 14(a), 10(b) and 21D of the Exchange Act.

88.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Biogen,

was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

89.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

90.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Biogen and was at all times acting within the course and scope of such agency.

<u>**BIOGEN'S CODE OF BUSINESS CONDUCT**</u>

*Code of Business Conduct*

91.     The Company's Code of Business Conduct begins by stating that it "applies to all [Biogen] employees, officers, and directors."

92.     The Code of Business Conduct states that "At Biogen, we understand and accept our responsibilities to respect and care for our patients, fellow employees and customers, to always act in accordance with our Ethical Principles and to comply with all applicable laws and regulations."

93.     In a section titled "**We are fair and honest**," the Code of Business Conduct provides:

> We operate fairly and honestly with all of our stakeholders and business partners and expect that they will do the same. Our books, records and financial statements must be honest, accurate, objective, complete and timely in order to ensure we make sound business decisions.

31

<u>We Communicate Transparently</u>
We are transparent and communicate truthful information in a manner that is not misleading. Our promotional, medical and investor information is appropriately vetted and approved prior to use.

<u>Maintaining Strong Business Partnerships</u>
We treat all our business partners fairly and honestly, and we expect them to act with integrity. In dealing with Biogen, suppliers and business partners must follow the Code.

94.    In a section titled "**Complete, accurate and timely disclosures and business records**," the Code of Business Conduct provides:

Our Company is subject to extensive and complex reporting requirements. Our operations must comply with all applicable regulatory, accounting, financial, tax and other rules and regulations of the jurisdictions in which we operate.

Business partners, government officials, investors and the public rely on the accuracy and completeness of our financial reports, business records and what we tell them. All of our financial records and accounts, and financial statements must be clear and complete, maintained in reasonable detail, and appropriately reflect our Company's transactions and activities. This includes our financial records and operational data such as cost and production data, expense reports and employee records. Accurate and complete information is also essential to us as a basis for sound decision-making.

The Company's filings with the Securities and Exchange Commission, as well as other public disclosures by or on behalf of our Company, must be fair, complete, accurate, timely, and understandable. Our accounting and financial reporting practices must also comply with applicable generally accepted accounting principles and other criteria, such as local statutory reporting and tax requirements. Depending on their positions with the Company, employees may be called upon to provide necessary information to assure that the Company's filings and public communications meet these standards. The Company expects employees to take this responsibility seriously and to promptly provide current, accurate and complete answers to inquiries related to the Company's public disclosure requirements.

95.    In a section titled "**Managing Our Records**," the Code of Business Conduct provides:

Each of us is responsible for information and records under our control so we need to be familiar with the records management procedures that apply to our jobs.

Biogen has a records and information management policy and procedures to ensure that our financial records and information are appropriately maintained, stored,

secured and destroyed in accordance with our business needs and in compliance with applicable laws and regulations.

We maintain paper and electronic records for as long as required by our policies and law and our records are organized so that they can be located and retrieved when needed. Documents should only be destroyed in accordance with our Global Records Retention and Disposition Policy, and never in response to or in anticipation of litigation, an investigation or an audit.

96.     The Code of Business Conduct states, in a section titled "**Insider Trading,**" that:

We [Biogen] will not use Biogen information or information from our business partners for personal benefit.

Our Global Insider Trading and Information Policy prohibits all of our directors, officers, employees, and temporary staff worldwide, as well as their immediate family members, from trading securities, or disclosing or passing along information to others who then trade (i.e. "tipping"), on the basis of material non-public information. You may only purchase or sell a company's securities if you are not in possession of material non-public information about the company. Additionally, certain individuals are subject to additional trading restrictions, which limit those individuals to trading in the Company's securities only during certain open trading windows or under a 10b5-1 trading plan.

Material information is information that a reasonable investor would consider important in deciding whether to buy or hold a security. Examples that may be considered material:
   o   A pending or proposed acquisition, sale or other significant transaction
   o   Results of late-stage clinical trials
   o   A significant product development or important information about a product, such as serious product safety issues
   o   Receipt of regulatory approval or failure to obtain regulatory approval for products
   o   Significant litigation or patent-related events
   o   Earnings or financial performance

Information is considered non-public if it has not been previously disclosed to the public through press releases or SEC filings and is otherwise not available to the general public. Information is generally considered "public" after it has been publicly available for at least 24 hours after disclosure.

Violations of the insider trading laws are severe and include civil and criminal fines and penalties. It is your responsibility to ensure that you do not violate the insider trading laws or our Global Insider Trading and Information Policy.

97.     The Code of Business Conduct states, in a section titled "**Compliance with laws, regulations, and standards**" that:

> We live and work in a global environment and fact a number of laws and regulations governing our industry's operations. These laws and regulations have a direct impact on our daily work. They also govern our interactions with our many business partners and associates such as researchers, patients, healthcare professionals and governments.
>
> We understand that these laws and regulations are there to help protect our employees and the patients, customers, and investors we serve. For that simple reason, we are committed to upholding the letter and spirit of these laws and regulations wherever we do business, succinctly summarized as follows:
>
> - Everywhere we operate; we must be aware of and comply with laws and regulations that govern our business activities
> - Since we operate in many different countries and jurisdictions, there may seem to be a conflict between applicable laws. When you encounter such a conflict, consult with the Legal Department.

98.     The Code of Business Conduct states, in a section titled "**We are transparent and ethical**" that:

> We do not offer or provide improper incentives, kickbacks, or bribes to win business, to influence a business or prescribing decision, or to advance our interests with government authorities. In particular, our interactions with healthcare professionals, government entities, government employees, and others must be legitimate and never to obtain and improper advantage or to improperly influence or encourage a decision by them.
>
> Cooperating with Regulators
> We will always comply with relevant laws and regulations and cooperate with government agencies, law enforcement officials and investigators. If you receive any inquiries from government regulators or officials, you should contact the Legal department immediately and wait for their guidance before responding to any such request. When notified of an external investigation, we will take prompt action to preserve documents that may be relevant and respond to requests for information in an honest and timely manner.
>
> We will promptly review all reports of misconduct and undertake investigations to gather additional information. All employees are expected to cooperate fully and truthfully with investigators. Never mislead an investigator and never alter or destroy any records in response to an investigation. Other important points you should know about the investigations process include:

- o The facts of the case will typically be developed through interviews and document review.
- o Depending on the nature of the investigation and the matters at issue, you may be instructed by the investigators or the Legal department not to discuss any aspect of the investigation.
- o If misconduct is discovered, the Company will take whatever corrective or disciplinary action is necessary to address the situation and prevent a recurrence.

99.     The Individual Defendants violated the Code of Business Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof. In further violation of the Code of Business Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## BIOGEN'S AUDIT COMMITTEE CHARTER

### *Audit Committee Charter*

100.     The Charter of the Audit Committee of the Board of Directors of Biogen (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

101.     Per the Audit Committee Charter, the Audit Committee's "purpose" is to "assist the Board of Directors in its oversight of:

- the integrity of the Company's financial statements;
- the accounting and financial reporting processes of the Company;
- the independence, qualifications and performance of the Company's independent registered public accounting firm;
- the effectiveness of the Company's internal control over financial reporting;
- the Company's tax strategy and internal audit and corporate compliance functions;
- the Company's financial strategy, policies and practices;

- management's exercise of its responsibility to assess and manage risks associated with the Company's financial, accounting, disclosure, ABAC (anti-bribery and corruption) and distributor matters; and
- the adequacy and effectiveness of the Company's insurance programs

102. The Audit Committee Charter lists the Audit Committee's responsibilities, a few of which are:

<u>Financial Statements and Disclosures</u>

- Discuss with management and the independent registered public accounting firm the annual audited financial statements and quarterly financial statements prior to filing, including related disclosures and matters required to be reviewed by the Committee under applicable legal, regulatory or Nasdaq requirements, and such other reports required to be provided by the independent registered public accounting firm under applicable accounting and auditing standards.

- Discuss with management and the independent registered public accounting firm, as appropriate, earnings results, and significant financial disclosure issues, including any related GAAP and nonGAAP annual and quarterly financial information that is included in earnings press releases, including pro forma or adjusted non-GAAP information, and other related financial information or earnings guidance contained therein and/or that is regularly provided to analysts and ratings agencies.

- At least on an annual basis, review with management and the independent registered public accounting firm the Company's financial reporting and accounting policies and principles significant changes in such policies or principles or in their application and the key accounting decisions affecting the Company's financial statements, including alternatives to, and the rationale for, the decisions made.

- Review with management and the independent registered public accounting firm the effect of regulatory and accounting trends, developments and initiatives on the Company's financial statements.

- Review and investigate, as appropriate, matters pertaining to the integrity of the Company's financial statements.

- Establish procedures for confidential and anonymous submission and treatment of complaints regarding the Company's accounting, internal controls, disclosure or other financial or auditing matters.

- Prepare and publish an annual Committee report in the Company's proxy statement in accordance with applicable SEC rules and regulations

\* \* \*

Internal Controls

- At least on an annual basis, review with management and the independent registered public accounting firm the adequacy and effectiveness of the Company's system of internal financial and accounting controls and the Company's disclosure controls, procedures and procedures, including their effectiveness.

- Review with management the Company's assessment of its significant financial, accounting, disclosure, ABAC (anti-bribery and corruption) and distributor risk exposures and steps taken by management to monitor and mitigate such exposures

\* \* \*

a)   Corporate Compliance. The Committee shall:

- Oversee the Company's ABAC, patient, healthcare provider and third party payor compliance program ("Corporate Compliance Program") and Chief Compliance Officer ("CCO").

- Approve the hiring, evaluation, compensation, and dismissal of the Chief Compliance Officer.

- Make appropriate inquiries of management and the CCO as to the budget of Corporate Compliance Program and approve the annual Corporate Compliance Program goals.

- Receive regular updates from the CCO regarding the effectiveness of the Corporate Compliance program, progress against goals and monitoring results.

Other Matters.

- Management is responsible for preparing the Company's financial statements and the independent registered public accounting firm is responsible for auditing those financial statements. The Committee is responsible for overseeing the conduct of these activities by the Company's management and the independent registered public accounting firm, which reports directly to the Committee. In carrying

out its oversight responsibilities, the Committee is not providing any expert or special assurances as to the Company's financial statements or any professional certifications as to the work of the independent registered public accounting firm.

103. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by issuing materially false and misleading statements to the investing public, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures and failing to adequately oversee the Company's disclosure controls and procedures.

## BIOGEN'S CORPORATE GOVERNANCE PRINCIPLES

104. In a section titled "**Ethics**" the Company's Corporate Governance Principles state the following:

> The Board expects Biogen directors, as well as officers and employees, to act ethically at all times and to acknowledge their adherence to the policies comprising Biogen's Code of Business Conduct. Any waivers of the Code of Business Conduct or other ethics policy for directors or executive officers must be approved by the Board. All waivers will be promptly disclosed as required by law or stock exchange regulation.

105. In violation of the Company's Corporate Governance Principles, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the

Company's Corporate Governance Principles, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Business Conduct. The Individual Defendants further failed to obtain waivers before violating the Code of Business Conduct and/or failed to disclose waivers permitting them to violate the Code of Business Conduct if they had actually obtained them.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

106.    Biogen is a global biopharmaceutical company that develops therapies for chronic and serious illnesses. As such, the Company has a broad portfolio of drug products.

107.    Historically, the Company's revenues were mainly driven by their MS-related products. However, as cheaper, generic versions of the Company's MS-related drugs entered the market, competition significantly increased. As such, Biogen saw a substantial decline in its product sales and revenues. To offset these declining MS-related product sales, the Company needed to shift to a new innovative product.

### Science Behind Aduhelm

108.    At the same time, Biogen was conducting trials into Aduhelm (at the time referred to by its chemical name, aducanumab).

109.    Aduhelm is what's referred to as a monoclonal antibody. A monoclonal antibody is a lab-made clone of a regular, naturally occurring antibody.

110.    An antibody is a protein that circulates through the body until it finds and attaches to proteins called antigens. Upon an antibody attaching to an antigen, the immune system cells are drawn to the antigen, which the cells then destroy.

111.    Defendants hypothesized that the reason amyloid-based treatments had failed prior was because the human body was unable to safely tolerate high doses of antibodies which are necessary to target all forms of amyloid beta, which is the main protein that makes up amyloid plaque. Instead, Aduhelm targets only aggregated amyloid beta, with little to no unproductive binding on amyloid beta monomers. In targeting the more specific aggregated forms of amyloid beta, Defendants believed Aduhelm can be given in high enough doses to be clinically effective.

112.    There are two main forms of aggregated amyloid beta, soluble oligomers and insoluble fibrils. Aduhelm ideally targets the fibrils.

**Early Aduhelm Trials**

113.    In 2011, Biogen submitted an Investigational New Drug Application to the FDA for Aduhelm. The Company initiated Phase I trials shortly thereafter.

114.    The first trial Biogen conducted, Study 101, was an ascending dose study of 53 subjects. Individual doses ranged from 0.3 to 60 mg/kg of Aduhelm, or placebo, and were administered to patients with mild to moderate Alzheimer's on a randomized, blind basis.

115.    The safety data from Study 101 was then used to inform the next study, Study 103, which began in 2012 and began yielding results in 2014.

116.    Study 103 consisted of a 12-month randomized, double-blind, placebo-controlled period, followed by a dose-blinded long term exposure period. 196 patients, who were between 50 and 90 years old with early symptomatic Alzheimer's and PET-confirmed brain amyloid pathology, in 27 clinical locations throughout the United States participated in Study 103.

117.    Study 103 also consisted of APOE4 carriers and non-carriers. One sect, comprised entirely of carriers, was designed to assess whether amyloid imaging abnormalities (ARIA) could be mitigated through titration, the process of adjusting doses of medication for maximum benefit.

118.    An APOE4 carrier is an individual who carries a gene that codes for production of apolipoprotein E, which is associated with higher rates of Alzheimer's. While APOE4 increases the odds of somebody developing Alzheimer's, not everyone who carries the APOE4 gene will develop Alzheimer's (and not everyone who develops Alzheimer's carries the APOE4 gene).

119.    The primary endpoint for Study 103 was safety and tolerability of Aduhelm. Secondary endpoints were the effect the drug had on the brain's amyloid content; the pharmacokinetics of Aduhelm; and the immunogenicity of Aduhelm. Exploratory endpoints included measures of clinical efficacy, including changes from baseline on a Clinical Dementia Rating – Sum of Boxes (CDR-SB) and Mini-Mental State Examination (MMSE) tests. These were later also used as endpoints in the Phase III trials.

120.    Study 103 yielded the following four major findings: (1) 10 mg/kg is the most effective dose of Aduhelm; (2) the CDR-SB scale is sensitive enough to detect changes in early symptomatic Alzheimer's patients; (3) There is a greater variability on the CDR-SB among patients with more advanced forms of the disease at baseline; and (4) in 2016, it was concluded that titration did lower the incidence of ARIA in APOE4 carriers as compared to fixed dosages.

**Phase III Trials**

121.    The results from Study 103 informed the Phase III studies that were set to begin in 2015. Studies 301 and 302 were identical global randomized double-blind, placebo-controlled parallel Phase III studies designed to show Aduhelm's safety and efficacy. Both trials included an 18-month double-blind placebo-controlled period, followed by a dose-blinded long term extension period.

122.    Studies 301 and 302 collectively enrolled 3,285 patients at 348 sites spread throughout 20 countries. The patients were between 50 and 85 years old, with early symptomatic

Alzheimer's disease, and positive for brain amyloid pathology as assessed by positron emission tomography (PET). Roughly 80% of the participants in each study would have a baseline clinical diagnosis of mild cognitive impairment, while the remaining 20% would have a diagnosis of mild Alzheimer's disease dementia, which would mean patients whose Alzheimer's has substantially interfered with their daily lives.

123.    Additionally, while both APOE4 carriers and non-carriers were enrolled, carriers accounted for approximately two-thirds of each study population.

124.    Clinical measures were evaluated in six-month intervals, with an evaluation coming at the six-month mark, the one-year mark, and the 18-month mark.

125.    While identical in design, Study 301 started approximately one month before Study 302, meaning that Study 301 led enrollment.

Clinical Endpoints

126.    Once Alzheimer's symptoms become noticeable, patients experience a progressive decline in their cognitive and brain functions. In order to measure this, the Company selected five clinical efficacy scales to measure the range of symptoms experienced by patients. The assessments on these scales are reliant on information as provide by patients, their caregivers, and independent clinical assessors. Each scale measures disease severity, with changes over time reflecting clinical progression.

1. CDR-SB

127.    The primary endpoint for both studies was the change from baseline in CDR-SB at week 78 (18-months). The CDR-SB scale integrates assessments from three areas of cognition (memory, orientation, and judgment/problem-solving) and three areas of function (community affairs, home/hobbies, and personal care).

128.    Upon interviewing the patient's caregiver, and examining the patient, a rater will assign a score that best describes the patient's current level in each of these areas. The "sum of boxes" scoring methodology adds the scores for each area, and provides a value ranging from 0 to 18 that can change in increments of 0.5. A higher score indicates more severe Alzheimer's.

2. MMSE

129.    The top-ranked secondary efficacy endpoint was the change from baseline in MMSE at Week 78 (18-months). MMSE is a performance-based test of global cognitive state. The test is comprised of eleven tasks to assess orientation, word recall, attention and calculation, language abilities, and geospatial functions. These tasks provide scores which are then combined to obtain a single score, which may range from 0 to 30. A lower score is indicative of higher cognitive impairment.

3. Alzheimer's Disease Assessment Scale – Cognitive 13-Item Scale (ADAS-Cog13)

130.    The next ranked secondary efficacy endpoint was the change in baseline in ADS-Cog13 at Week 78 (18-months). ADAS-Cog13 measures both cognitive tasks and clinical ratings of cognitive performance. ADAS-Cog13 concentrates on, among other things, word recall, ability to follow directions, ability to copy or draw an image, ability to interact with everyday objects, naming, word recognition, memory and concentration. Scores can range from 0 to 85, with a higher score indicating higher cognitive impairment.

4. Alzheimer's disease co-operative study ADL scale for mild cognitive impairment (ADCS-ADL-MCI)

131.    The final secondary efficacy endpoint tested was the change from baseline in ADCS-ADL-MCI at Week 78 (18-months). With this test, caregivers rate a patient's actual functioning over the previous month on a series of 18 items (including shopping, preparing meals,

and getting dressed). Caregivers also must assess the changes in the functional state of patients over time. Scores range from 0 to 53, with lower scores reflecting functional deterioration.

### 5. 10-item Neuropsychiatric index (NPI-10)

132.    The tertiary endpoint on the studies was the change from baseline on NPI-10 at Week 78 (18-months). In NPI-10, interviewers compile indices of the presence, frequency and severity of 10 neuropsychiatric symptoms, including delusions, hallucinations, depression, anxiety and euphoria. Scores range from 0 to 120, with higher scores indicating more severe symptoms.

### Biomarkers

133.    The Company also assessed various biomarkers to study the impact Aduhelm had on brain pathology. Positron emission tomography scans were run on a subset of patients to determine if patients who received Aduhelm also showed a larger reduction in amyloid plaque in their brains than those who received placebos. As such, the Company was able to tell whether removal of amyloid plaque correlated with more optimal clinical outcomes.

### Doses Studied

134.    Participants in the Phase III studies were split into three groups, based on a 1:1:1 randomized ration. The three groups were high dose group, the low dose group, and the placebo group.

135.    Due to concerns about APOE4 carriers' risk of developing ARIA, the randomization was also stratified by APOE4 status. As such, carriers who were part of the low dose group received 3 mg/kg after titration over 8 weeks, while non-carriers received 6 mg/kg after titration over 24 weeks. Similarly, carriers who were part of the high dose group received 6 mg/kg after titration over 24 weeks, while non-carriers received 10 mg/kg after titration over 24 weeks.

### Amendments

44

136.    As the result of decreasing concerns surrounding the possible side effect of ARIA, the Company implemented two amendments to the Studies. These amendments were:



Timing of Amendments

1. Protocol Version 3

137.    The first amendment, dubbed "Protocol Version 3," was implemented in July 2016 and related to ARIA management.

138.    The Phase III trials had initially started with an ARIA management program similar to the one utilized in Study 103. The program required suspending dosing under certain circumstances, such as when ARIA was accompanied by mild or moderate symptoms. Upon resolution of the ARIA, dosing could be restarted at the next lowest dose. The participants were then required to remain at that dose for the remainder of the trial. For participants who had more severe symptoms, the dosing was discontinued permanently.

139.    Under Protocol Version 3, participants whose dosing had been suspended and was later resolved were then able to restart dosing at the same dose (as opposed to the lower dose), and

continue titration to the target dose. Participants with certain severe symptoms were also able to suspend dosing, as opposed to permanently discontinuing dosing.

140.    In sum, Protocol Version 3 allowed participants who experienced ARIA, almost all of whom were APOE4 carriers, to continue and reach their assigned target dose of Aduhelm.

<u>2. Protocol Version 4</u>

141.    The second amendment, Protocol Version 4, was adopted in March 2017. Protocol Version 4 was based on ARIA data from the final enrolled group of Study 103, which showed that 10 mg/kg doses could safely be given to APOE4 carriers. As such, Protocol Version 4 increased from 6 mg/kg to 10 mg/kg for carriers in the high dose group. The dosages in the low dose group remained unchanged.

<u>Futility Analysis</u>

142.    The Phase III study protocol allowed for an interim analysis for futility which would allow the Company to terminate the studies early if it appeared that Aduhelm was unlikely to be proven effective.

143.    The interim futility analysis would not be conducted until approximately half the participants in the studies completed the Week 78 primary efficacy assessment. The data cutoff date for this analysis was December 26, 2018.

144.    The analysis was performed by an independent group, external to Biogen and not involved in the studies.

145.    A finding of futility would exist if the trials had less than a 20% chance of meeting primary endpoints, pooling the data across both trials (called conditional power). As such, if there was a less than 20% chance that final study would be statistically significant in both the low and high dose groups of both studies the studies would be ended.

146.     The predetermined criteria for a finding of futility was based on conditional power for CDR-SB, which is the probability calculated on the data at the interim date that the final data would show statistical significance in favor of Aduhelm.

147.     The reasoning behind the pooled data was due to the statistical notion that pooling is better than examining the trials separately, as long as the trials are mainly homogeneous. Because both trials were identically designed, the Company did not expect there would be significant homogeneity between trials.

148.     Ultimately, the futility analysis showed an estimated conditional power values for CDR-SB in the high dose group were 12% for Study 302, and 0% for Study 301. As such, the probability of a statistically significant difference at the end of the studies were below the prespecified cutoff of 20%, and the studies were considered futile.

149.     As such, the Company terminated the Phase III trials, announcing the results to the public in a press release on March 21, 2019.

**Running Out of Options, It was Evident Biogen Needed Aduhelm**

150.     Upon the announcement that the Company would be terminating the Phase III Aduhelm trials, investors made it clear that the Company needed to come up with a new drug, or they would start jumping ship. Per one report by Jeffries on April 24, 2019:

> Management addressed three issues on the Q1 call: Tec IPR, Spinraza competition, and BD/M&A. Yet the most common investor question we receive relates to the potential for a near-term catalyst to get excited about. ***Investors who thought there might be near-term "value creation" or "strategic alternatives" were left with nothing to cling to as comments focused on continued [stock] buybacks and long-term pipeline diversification.***[2]

---

[2] All emphasis added unless otherwise noted.

151.    Worse yet, other analysts were concerned that Aduhelm's failure already meant Biogen was dead in the water. On October 9, 2019, Biogen was the first profile in J.P. Morgan's *The Excavator* series of reports, which detailed companies that were headed for extinction. The report, which was over 100 pages long, started:

> So what does the future hold [for Biogen]? First and foremost (and maybe most obvious), the outlook for top-line growth appears challenged, with MS, SMA, and royalty revenue all at risk and a lack of exciting, de-risked pipeline candidates ready to step up. Secondly, it's clear from our conversations that investors are waiting for Biogen to bring in some late-stage assets with tangible value; however, for a number of reasons (willingness, cost / availability of targets, etc.), this could be an uphill battle and may never even materialize (sometimes you just have to trust what you see). Further complicating matters – at least for the short term – is the lingering uncertainty around Tecfidera IP. With all of this on the horizon, we struggle to get constructive on the name and believe that the onus is on management to change this dynamic.

152.    Throughout the Relevant Period, investors only seemed to care about Aduhelm. One Jeffries analyst noted on April 21, 2020 that for "every question related to fundamentals, we get 10 questions on Alzheimer's status."

153.    On July 8, 2020, a report by a J.P. Morgan analyst stated that "with mounting pressures on the core MS/SMA franchises lowering [Biogen]'s perceived floor valuation, everything appears to be riding on this single, controversial asset [Aduhelm]."

154.    Lastly, in a November 3, 2020 article, an analyst from Wolfe Research stated, "[b]y our modeling at least, [Biogen] lives and dies by how aducanumab plays out. This is because [Biogen]'s underlying revenue base is like quicksand due to patent expiries and competitive threats."

**The Individual Defendants Cause the Company to Manipulate the Data in its Favor**

155.    In order to resuscitate Aduhelm, the Company needed to find data to refute the futility analysis. In order to find Study 302 statistically significant on its primary endpoint, the

Company used additional patient data that was collected between when the futility database was locked and when futility was declared. Using this data, the Company was able to determine that Study 302 was statistically significant (albeit just barely), and therefore a success.

156.    Study 301 proved to be more difficult. As the patients who took part in Study 301 showed that those who were apart of the high dose group fared worse than those who were in the placebo group, Study 301 was an outright failure. As such, barring some reason justifying the difference in results between Study 301 and Study 302, the Company was aware that, at best, the FDA may ask they run a third study, which may take an additional three years. Not having that kind of time, the Company sought to avoid that outcome.

157.    As such, Biogen tasked 49 of its own statisticians to go through the Phase III data to find anything that would be able to support Aduhelm's approval. This process, in which researchers perform multiple analyses to yield a statistically significant result, is called "p-hacking" and is generally considered unreliable and a form a data manipulation.

158.    The "p" in p-hacking is a reference to a study's "p-value," a statistical measure that shows the probably that the study's results were not due to chance alone. However, what the p-value cannot show is whether a drug actually had its intended effect, and to what extent that drug is effective. A p-value only shows how surprising the results would be were the drug not effective.

159.    Eventually, the Company's p-hacking worked, as the statisticians identified that, because the Protocol Version 4 amendment was implemented in both studies at the same time, but Study 301 started before Study 302, more APOE4 carriers in Study 302 received the maximum 10 mg/kg dose of Aduhelm for larger portions of their treatment, leading to the studies' different outcomes. Despite one doctor claiming that the claims about Study 301 "don't make any sense at

all," the Company used this as its justification for proclaiming both Studies to be successful and Aduhelm to be ready for FDA approval.

**Defendant Sandrock has a Secret Off-the-Books Meeting with FDA's Office of Neurology Billy Dunn to Discuss Aduhelm Approval**

160.    In addition to manipulating the results of the Phase III studies, the Company also improperly manipulated an FDA Office in their desperate attempt to approve Aduhelm.

161.    According to a June 3, 2021 STAT News article, in or around May 2019, Defendant Sandrock approached the head of the FDA's Office of Neurology, Billy Dunn, to discuss Aduhelm.

162.    Both Sandrock and Dunn had the opportunity to meet with each other while attending the American Academy of Neurology 2019 Annual Meeting in Philadelphia from May 4-11, 2019. They used this occasion to meet secretly, off-the-books and off-the-record, in violation of FDA practice. The existence of this meeting was not known until the publishing of the STAT News Article, which was then confirmed in a July 20, 2021 *New York Times* article.

163.    During the meeting, Defendant Sandrock told Dunn that he believed Aduhelm may slow the progression of Alzheimer's, before asking Dunn if he would consider helping Biogen find a way to approve Aduhelm.

164.    While his answer is unknown, Dunn must have agreed, as shortly after the meeting the Company initiated Project Onxy in an effort to obtain FDA approval for Aduhelm despite the futility assessment.

165.    This agreement also reversed the FDA's prior plans to evaluate Aduhelm. According to the minutes of the December 2014 Meeting between the FDA and the Company, Biogen was aware that the FDA would not approve Aduhelm should the Phase III studies show conflicting results, stating:

> The Agency had no objection in principle to [conducting two parallel Phase III studies]; however, the Agency also observed that should only one of the two studies then be positive, and the other study negative, for efficacy (and assuming the primary efficacy measures used in those studies are appropriate**), such results would not ordinarily support the approval of [aducanumab] for an indication similar to that which the sponsor is currently pursuing.**

166.    Despite the off-the-books meeting effectively reversing the FDA's on-the-books decision as to how it will make Aduhelm's approval possible, the Company and FDA's public statements omit it entirely. Instead, Biogen and the FDA informed the advisory committee in public materials that the collaboration started later, when the Company gave its data to the FDA:

### 3.3.2. Biogen-FDA Collaborative Investigation

> Biogen shared the March 2019 results with the FDA, seeking the Agency's counsel and expert opinion on the appropriateness and interpretation of the analyses.

167.    With Dunn on their side, the Company began to focus its attention on providing Dunn with the necessary information to support his efforts to get the FDA to grant Aduhelm approval, regardless of what the clinical data showed. The STAT News article quoted on former Biogen employee as saying, it "was clear that Billy Dunn was an ally, so the job for Biogen became figuring out how to support his efforts within the FDA." A second former employee who ha knowledge of the Company's interactions with Dunn and other FDA officials was quoted in the STAT News article as stating, "I knew from the interest levels within FDA that the agency was always going to find a way to approve Aduhelm."

168.    By mid-May, the Company was sharing clinical data and additional information with FDA officials.

169.    All of this led to a June 14, 2019 Type C meeting ("June 2019 Type C Meeting") with the FDA, led by Dunn. Per the STAT News article, Dunn's office gave Biogen a roadmap for

approval *without* seeing any additional analyses. The FDA provided five paths for approval and failed to consider the possibility that Aduhelm would not be approved.

170.    The meeting minutes, which were ultimately published, confirm the article. The minutes confirm that the FDA presented Biogen with five "options" they could pursue after conducting additional analyses, stating:

> A number of potential options may be available, depending on the results of additional analyses already available. These additional analyses would largely be the focus of the collaborative working group. The following 5 options were discussed.

171.    One option existed for where "[a]dequate evidence exists to conclude that aducanumab is ineffective," granted the applicant is usually given the burden of proving efficacy. The summary of the discussion explicitly stated that the FDA had already ruled out this choice:

> The termination of the clinical development of aducanumab as a treatment for Alzheimer's disease would be predicated on a conclusion that adequate evidence exists to establish that aducanumab is ineffective (or is highly likely to be ineffective) for the treatment of Alzheimer's disease. ***For the reasons noted above, that is not the case***.

172.    Given this, Dunn had decided to approve Aduhelm before the June 2019 Type C Meeting. He then spent the next two years pushing it through the approval process regardless of what the data showed.

173.    The FDA and Biogen's joint presentation to the advisory committee falsely claims the contrary, stating:

> At this meeting, the FDA concluded in the minutes that "it would have been more appropriate if futility had not been declared for those studies." After noting that "the effect of early termination of the studies on the interpretability of the observed efficacy data and associated analyses ***is a matter for further detailed consideration***," the FDA further noted, "on face, that the effects of aducanumab in [Study 302] ***might*** not only be interpreted as being supportive of the efficacy of that compound in Alzheimer's disease, but ***might*** also be considered exceptionally persuasive on several of the instruments used to evaluate efficacy."

The FDA noted, "Further complicating the interpretation of the available data for Studies 301 and 302 are the partially conflicting results … for Study 301 as compared with those for Study 302, with particular attention to the discordant high dose results of each study (while noting an apparent degree of consistency of the low-dose results between the studies). A detailed understanding, informed by plans for further analyses …, of the overall results, and especially these discordant results, is critical to any **consideration of whether** Study 302 (with or without possible support from Study 301, as might be determined from further explorations of the data) **might** provide evidence adequate to establish the effectiveness of aducanumab for the treatment of Alzheimer's disease." The FDA further stated that "the submission of a marketing application for aducanumab based primarily on the results of Study 302 as a single positive efficacy study **may also** be considered. **It is possible** that the results of Study 301 **may** have a role in supporting the results of Study 302 or **may** be understood well enough to be dismissible (i.e., to not represent evidence that the drug is ineffective), **assuming that further analyses do not lead to a conclusion that Study 301 is clearly negative**."

After citing the **possibility** that aducanumab **could be** an effective drug for the treatment of Alzheimer's disease based on the Study 302 data presented, the FDA stated, "It is imperative that extensive resources be brought to bear on **achieving a maximum understanding of the existing data**. Given the wholly unique situation that is the current state of the aducanumab development program …, those further analyses would best be conducted as part of a bilateral effort involving the Agency and sponsor, i.e., through a 'workstream' or a 'working group' collaboration."

174.    The disclosures made to the advisory committee greatly understated the level of collaboration between the FDA and Biogen. Per the STAT News article, the FDA and Biogen met or communicated almost every day throughout June, July, and August of 2019. They even jointly decided on which method would be used to push for Aduhelm's approval, which was the standard FDA approach.

**The Aduhelm Approval Process**

175.    On October 22, 2019, three weeks after *The Excavator* report, the Company publicly announced it was reviving Aduhelm.

176.    Biogen completed its submission to the FDA on July 7, 2020.

177.    In order to assist in its determination for the approval of Aduhelm, the FDA empaneled an advisory committee. A decision to empanel such a committee was no surprise, as

the FDA relies on these committees to provide independent advice where "a scientific, technical, or policy question arises, such as whether an unapproved product is safe and effective." Further, given Aduhelm's troubled history and analyses, the advisory committee would be useful as it lends credibility to the FDA's decision.

178.    On November 4, 2020, the day before the meeting with the advisory committee, the FDA released briefing materials to the public.

179.    Among the briefing materials were:

    a)  A 343-page report from the FDA and Biogen;

    b)  An over 90-minute presentation pre-recorded by Biogen;

    c)  An over 50-minute presentation pre-recorded by the FDA's efficacy reviewer;

    d)  A 7-minute presentation pre-recorded by the FDA's safety reviewer; and

    e)  A 45-minute presentation pre-recorded by Tristan Massie, PhD, the FDA's statistical reviewer for Aduhelm's application.

180.    The joint report was the first time in FDA history that the FDA filed a report jointly with a sponsor. The report mainly set out the Company's position, with the FDA inserting short, paragraph-long comments. The majority of the FDA's comments were simply agreements to Biogen's position.

181.    The FDA characterized Study 302 was a positive study and that caused the FDA to find reasons why Study 301 was wrong as opposed to evidence that Aduhelm was simply ineffective, stating:

> A guiding principle of the hypothesis was that if aducanumab is effective and the effect is dose-related as in Study 302, it follows that patients in Study 301 with adequate and consistent dosing should also demonstrate an effect on clinical endpoints.

182.    The FDA then agreed that the Company could use its Phase Ib study, Study 103, as the supporting study to approve Aduhelm, even if it was simply an exploratory study.

183.    In conclusion, the FDA stated that the "effect of aducanumab in Study 302 is *robust and exceptionally persuasive* on *several* of the instruments used to evaluate efficacy."

184.    Appendix 1 to the report was a clinical review by Dr. Kevin Krudys, who had recently moved to the Office of Neurology and was reporting to Dunn.

185.    The report by Dr. Krudys concluded that ""the applicant has provided substantial evidence of effectiveness to support approval."

186.    Appendix 2 to the report was a draft version of Massie's report, with a very prominent DRAFT watermark on it. It is very uncommon for a statistical review that is presented to an FDA advisory committee to be identified as a draft. This, combined with the FDA's positive clinical review and presentation, made it indicative that the FDA was trying to draw attention away from Massie's report.

187.    Additionally, the advisory committee was presented with questions on which to vote and discuss. As was noted by members of the advisory committee, the questions were clearly biased in favor of approval. The first question required the committee to completely ignore Study 301. The next question asked the committee whether Study 103 provided support. The third question asked the committee if the Company had shown evidence that Aduhelm removed plaque. Whether the removal of plaque did anything to benefit the cognitive decline in patients was irrelevant. The fourth question asked whether Study 103 and Study 302 supported approval in light of a post hoc analysis of Study 301.

188.    The advisory committee met on November 6, 2019. Late in the day, the committee voted on the FDA's questions. The panels votes were:

Question 2: Does Study 302, viewed independently and without regard for Study 301, provide strong evidence that supports the effectiveness of aducanumab for the treatment of Alzheimer's Disease?

Yes: 1                          Uncertain: 2                          No: 8

Question 4: Does Study 103 provide supportive evidence of the effectiveness of aducanumab for the treatment of Alzheimer's Disease?

Yes: 0                          Uncertain: 4                          No: 7

Question 6: Has the Applicant presented strong evidence of a pharmacodynamic effect on Alzheimer's disease pathophysiology [i.e., does aducanumab reduce amyloid plaque]?

Yes: 5                          Uncertain:6                          No: 0

Question 8: In light of the understanding provided by the exploratory analyses of Study 301 and Study 302, along with the results of Study 103 and evidence of a pharmacodynamic effect on Alzheimer's disease pathophysiology, is it reasonable to consider Study 302 as primary evidence of effectiveness of aducanumab for the treatment of Alzheimer's disease?

Yes: 0                          Uncertain: 1                          No: 10

189.   The advisory committee accused the FDA of "complicity with Biogen in putting forth the unacceptable analyses, with one member stating he was "very, very, very disturbed by some of the analyses that were considered." Another member stated that the FDA does "an extraordinary amount of explaining around the contrary findings," even adding that "*I have a very hard time understanding*, after carefully reviewing what I thought was a very well done and well-articulated [FDA] biostatistical review, which convincingly argued the evidence was 'at best compellingly conflicted,' *how the FDA could conclude that there are substantial evidence of*

*effectiveness*[.]" Almost all the committee members also complained about the "biased" nature of the questions posed to the committee.

**The FDA Approves Aduhelm Through an Unused Process and the Subsequent Fallout**

190.    Despite the outcome of the advisory committee vote, on June 7, 2021, the FDA approved Aduhelm using a never before used process called accelerated approval.

191.    An approval under the accelerated approval process occurs when the FDA approves a drug even when a sponsor has been unable to show its effectiveness. In order to be eligible under an accelerated approval pathway, an applicant must show, among other things, that the clinical trials did have an impact on a surrogate endpoint, which is a marker that is used as a substitute for a direct clinical measure. The FDA's willingness to approve Aduhelm through an accelerated approval process was surprising because, among other reasons, the FDA declared as late as 2018 that there were no surrogated endpoints for Alzheimer's.

192.    Nothing has changed since the FDA made this declaration, nor has the FDA ever announced anything that would provide grounds to change its mind.

193.    Further yet, during the advisory committee meeting, the FDA indicated that it would not approve Aduhelm based on a surrogate endpoint, effectively preventing the committee from advising against such approval:

> Perlmutter: [The question is] for the sponsor. It could be answered by either one, actually, two related questions.
>
> One is, in 301, if the high-dose response – the lack of response was due to a lower dose, but yet the lower dose in 301 provided [a] benefit, was the lower dose in a high dose lower than the lower dose? Does that fit on the dose-response curve?
>
> Then the second part of my question is if we're using the PET A-beta measurements as a biomarker of efficacy, wasn't there a lack of correlation between the response in the PET findings with the CDR-SB, and how do you explain that if that biomarker is relevant for their clinical benefit?

Dunn: This is Dr. Dunn. I can speak to the second one. We're not using the amyloid as a surrogate for efficacy.

* * *

Fountain: I think we have the opportunity now to ask the FDA a question about the correlation of amyloid with clinical change in Study 302. I'm not sure who's Dr. Dunn, Dr. Krudys, or someone else is going to address that.

Krudys: [] And second, I'll just say that it's not like change in beta-amyloid are being used as a surrogate here. It's a biomarker of what the drug is doing, and there is some correlation between the changes and changes of clinical outcomes.

194.    The FDA's approval of Aduhelm sent shockwaves throughout the industry.

195.    Upon the FDA's announcement, three of the advisory committee's nine permanent members resigned, with one member calling it "probably the worst drug approval decision in recent U.S. history."

196.    Public Citizen, an influential good government non-governmental organization called for the immediate termination of Dunn, Dr. Patricia Cavazzoni (head of the FDA's Center for Drug Evaluation and Research), and acting FDA Commissioner Janet Woodcock.

197.    Senator Joe Manchin publicly called for President Bident to replace Woodcock, stating:

> While the approval of a drug provides hope for the millions of Alzheimer's patients and their families, many scientists have second-guessed the scientific benefit of this approval. The FDA's, and in particular Dr. Woodcock's, decision to go against its advisory committee's decision yet again has resulted in at least three scientists resigning from the committee. In his resignation letter, Dr. Aaron Kesselheim noted that this approval was "probably the worst drug approval decision in recent U.S. history."[citation] This brings into question the current interim leadership of Dr. Woodcock, at a time when strong, trusted leadership at our health agencies is most important. At a minimum, the agency should provide an explanation as to why it chose to go against its advisory committee's recommendations. Having a permanent agency head in charge to answer patients and doctors questions on this approval, as well as assure the general public of the FDA's commitment to public health, is imperative, and Dr. Woodcock is not the right person to lead the FDA.[3]

---

[3] Letter from Senator Joe Manchin to President Joseph R. Biden, Jr., dated June 17, 2021,

198.    The House Committee on Oversight and Reform and the house Committee on Energy and Commerce both launched investigations in the approval decision, stating:

> We have serious concerns about the steep price of Biogen's new Alzheimer's drug Aduhelm and the process that led to its approval despite questions about the drug's clinical benefit.
>
> We strongly support innovative treatments to help the millions of Americans who suffer from Alzheimer's disease, but Aduhelm's approval and its $56,000 annual price tag will have broader implications for seniors, providers, and taxpayers that warrant close examination.
>
> Our Committees will be investigating this matter so Congress and the American people can better understand why this drug was approved, how Biogen set its price and what impact this will have on research for future Alzheimer's treatments and federal health care programs.[4]

199.    In addition to the investigations, Representative Katie Porter also called for the Department of Health and Human Services to investigate the Company's communications with the FDA regarding Aduhelm:

> It appears very clear that Biogen had an inside route to FDA officials and had undue influence over their decision making and the evidence presented in various settings. While I respect the FDA's scientific expertise, it has become clear through various cases, including Rick Bright's whistleblower suit last year and the recent approval of Aduhelm, that too many pharmaceutical executives, lobbyists, and other stakeholders have long had inappropriate access to officials throughout the Department of Health and Human Services.[5]

200.    The investigations only intensified upon the revelations made upon the publication of the STAT News article. On July 12, 2021, Representatives Carolyn Maloney and Frank Pallone sent document requests to Defendant Vounatsos requesting, *inter alia*, "[t]he dates, times,

---

available at
https://www.manchin.senate.gov/imo/media/doc/letter_to_white_house_regarding_fda.pdf?cb
[4] House Committee on Oversight & Reform, Chairs Maloney and Pallone Announce Investigation of Biogen's Alzheimer's Drug Aduhelm, available at
https://oversight.house.gov/news/pressreleases/chairs-maloney-and-pallone-announce-investigation-of-biogen-s-alzheimer-s-drug
[5] https://twitter.com/RepKatiePorter/status/1412534817749602314

locations, attendees, and any notes or minutes taken of all calls and informal and formal meetings or discussions among FDA officials or personnel and representatives of Biogen related to aducanumab, and all related communications[.]" The accompanying letter linked the requests to the revelations that had been made in the STAT News article the month prior.

201.    Additionally, the STAT News article prompted the FDA to investigate itself. In a July 9, 2021 letter, FDA Commissioner Woodcock told Health and Human Services Acting Inspector General Christi A. Grimm:

> [T]here has been significant attention and controversy surrounding the process for review of Biogen's biologics license application (BLA) for Aduhelm (aducanumab) for the treatment of Alzheimer's disease. This includes an ongoing focus on interactions between Biogen and Food and Drug Administration (FDA) staff during the review process. I write, therefore, to request an independent review and assessment of interactions between representatives of Biogen and the FDA during the process leading to the decision to approve the BLA to determine whether any of those interactions were inconsistent with FDA policies and procedures.

202.    The Department of Health and Human Services announced its own investigation into the accelerated approval process the FDA used to approve Aduhelm on August 8, 2021.

203.    In addition to these governmental investigations, the medical community reacted to the approval of Aduhelm in its own way. On July 11, 2021, six Blue Cross/Blue Shield state=level affiliates announced decisions to decline to cover Aduhelm, with Blue Cross and Blue Shield of North Carolina explaining its decision as "[c]linical studies failed to demonstrate the effectiveness of Aduhelm [.] while documenting significant risks, like brain swelling and bleeding."

204.    Additionally, on July 15, 2021, the Cleveland Clinic and Mt. Sinai Health System, the seventh and eight largest in the country, respectively, announced they would neither stock nor administer Aduhelm. That same day, a 15-member panel of experts from the California Technology Assessment Forum concluded, in a unanimous decision, that the Company had not shown that Aduhelm was safe or effective.

205.    On November 15, 2021, the Company announced Defendant Sandrock's resignation from the Company. In a report by Bloomberg Business News the following day, Bloomberg noted that Sandrock's "abrupt departure" was not "entirely benign as Sandrock has been the most public voice at the company defending the drug's data and approval process."

206.    On November 17, 2021, the Company announced that it was unlikely the European Union would approve Aduhelm.

207.    On November 22, 2021, JAMA Neurology report revealed safety data showing that 41% of patients taking Aduhelm either experienced bleeding or swelling in the brain. Per Bloomberg Business News, this study was "one of the first formal publications of data from the company's two final-stage trials of Aduhelm. . . . About 19% of patients who received the dose had brain bleeding that showed up on imaging, which sometimes overlapped with swelling, the study found. A total of 41% of patients had either brain swelling, bleeding or both. Of those cases, 14 were judged to be serious, including some people who were hospitalized."

208.    On December 20, 2021, the European Union's Committee for the Medicinal Products for Human Use officially rejected Aduhelm's application for use in the European Union.

209.    Two days later, on December 22, 2021, the Company announced that Japan was unlikely to approve Aduhelm, meaning that the Company would be almost completely reliant on sales within the United States. This proved to be problematic, as many medical providers were hesitant to prescribe the treatment for use within the United States.

**The Company Attempts to Get Aduhelm Approved for Medicare Reimbursement**

210.    The day after Aduhelm received its FDA approval, the Company turned to its next steps in commercializing Aduhelm. One of those steps involved getting Aduhelm approved for

Medicare reimbursement, which the Individual Defendants claimed was "automatically presumed" upon receiving FDA approval of a drug.

211. Medicare coverage follows a complex regulatory process.

212. For a physician-administered drug (under Medicare Part B), such as Aduhelm, a reimbursement for Medicare-eligible patients comes in one of two primary routes: (1) regional Medicare fee for service contractors (MACs) and (2) Medicare Advantage plans. Approximately 65% of Medicare patients are covered by the regional MACs, while the remaining 35% are covered under Medicare Advantage plans. As of January 2020, CMS holds the regulatory authority to direct MACs and Medicare Advantage to consider which treatments are "reasonable and necessary" in the course of determining coverage.

213. CMS also has the option to initiate a National Coverage Determination ("NCD"), which formalizes the requirements for reimbursement across all plans. Typicallym a NCD is a 12 to 18 month process that usually leads to narrower coverage "than what the indication statement would lead us to." This was not concerning to the Company as it was expected. NCDs are not uncommon where a drug has been approved under an accelerated approval process by the FDA, is expensive, or where controversy exists surrounding a treatment's efficacy, side effects, or safety. All of those situations existed for Aduhelm, pointing to a NCD.

214. On July 12, 2021, as was expected, CMS announced the beginning of a NCD analysis into whether, and under what circumstances, Aduhelm would receive Medicare reimbursement.

215. Despite this expectation, the Company chose not to push back on the broad label received by the FDA approval. In a September 2020 presentation to the Board, Defendant Alaimo, Deb Glasser (head of Biogen's Alzheimer's franchise), and other senior executives made explicit

their assumption that a broad indication statement and low initial use in patients due to payer restrictions would still lead to $8.7 billion in Aduhelm revenue by 2024.

216.    On January 11, 2022, CMS announced in a draft decision that it would only approve Medicare reimbursement for Aduhelm to patients who were enrolled in a clinical trial.

**Significant Post-Relevant Period Developments**

217.    On February 4, 2022, the Company announced that the Federal Trade Commission ("FTC") and SEC were also investigating the Company over claims it made regarding the amount of "healthcare sites" that would be administering Aduhelm, the FDA's approval of Aduhelm, and the marketing the Company made surrounding the treatment.

218.    On March 13, 2022, over 5 months after Defendant Vounatsos promised providers they would have access to the peer-reviewed data on Aduhelm, the Company published it's the results of its Phase III studies in a minor academic journal.

219.    On May 3, 2022, the Company announced that Defendant Vounatsos was stepping down as CEO, effective upon the Company finding a suitable replacement. Additionally, it was announced that the Company was functionally ending its commercialization of Aduhelm, eliminating all employees responsible for the sales and marketing of the treatment. As reported by the Wall Street Journal: "The company will substantially eliminate the sales infrastructure it built to support Aduhelm's launch, including employees to promote the drugs to doctors and provide logistical assistance for navigating the complex process of administering it to patients," noting "the cuts will comprise the bulk of an estimate $500 million in annual savings that the company is targeting."

220.    On January 31, 2024, the Company announced that Aduhelm would be discontinued as it turns its attention and resources to its other Alzheimer's medication, Leqembi.

## FALSE AND MISLEADING STATEMENTS

*October 22, 2019 Earnings Call*

221.    On October 22, 2019, the Company hosted an earnings call with investors and analysts to discuss its financial results for the third quarter of the 2019 Fiscal Year (the "Q3 2019 Earnings Call"). During the Q3 2019 Earnings Call, Defendant Vounatsos stated:

> [T]he new analysis of the larger dataset, which was conducted in consultation with the FDA, showed that aducanumab had a dose-dependent effect *on the underlying pathology as measured by amyloid-PET imaging and reduced clinical decline in patients with early Alzheimer's disease* as measured by the pre-specified primary and secondary endpoints.

222.    Also on the Q3 2019 Earnings Call, Defendant Sandrock told investors of Aduhelm's revival:

> *Our primary learning from these data is that sufficient exposure to high dose aducanumab reduced clinical decline across multiple clinical endpoints. This reduction in clinical decline was statistically significant in EMERGE, and we believe that patients – that the data from patients who achieved sufficient exposure to high dose aducanumab in ENGAGE support the findings of EMERGE*. After consultation with the FDA, we believe that the totality of these data support a regulatory filing. *Importantly, patients included in the futility analysis were those who had enrolled early in the trials and those early enrolling patients had a lower average exposure to aducanumab in large part due to two protocol amendments that occurred sometime after the start of the trials. These two protocol amendments were put in place precisely to enable more patients to reach high dose aducanumab, and for a longer duration. As a consequence, the larger dataset available after trial cessation included more patients with sufficient exposure to high dose aducanumab*.

223.    Defedant Sandrock later stated on the call:

> *So in other words, what I'm saying is that there is a very sort of sharp dose response, if you will, you have to get to high dose of aducanumab and intermediate dosing at least in an 18-month trial is not enough*.

224.    Defendant Budd-Haeberlein also offered her own explanations on the call, stating that "*dosing is a complex combination of duration, magnitude and no interruptions*." She then added that "*you need to achieve high dose for long enough, but also have no interruptions, and*

*so that's a more complex calculation between the two studies*." On the dosing issue, Defendant

Sandrock further added:

> I think that dose suspension in the context of an 18-month study was – it could be problematic, ***because they didn't achieve enough of the high dose.*** But in clinical practice, we don't do 18-month treatment periods. We're going to treat patients for longer periods of time. And in that situation I think dose suspension may be acceptable in some patients.

225.    Defendant Budd-Haeberlein further went on to explain the nature of CSF

biomarkers, stating:

> Aducanumab also demonstrated an impact on CSF biomarkers of tau pathology. A statistically significant reduction on CSF phospho-Tau levels was observed in EMERGE and ENGAGE with a dose proportional response in EMERGE. Aducanumab produced a numeric reduction in CSF total-Tau levels in EMERGE and ENGAGE with a dose proportional response in EMERGE. ***Although the primary and secondary endpoints were not met in ENGAGE in post analysis, the subset of patients who received sufficient exposure to 10 milligram per kilogram aducanumab in this case, at least 10 doses of 10 milligram per kilogram showed similar results to the comparable population from EMERGE, in terms of both amyloid plaque reduction and reduced clinical decline on CDR-SB.***

226.    Defendant Budd-Haeberlein continued, stating:

> ***I think what we have learned clearly is that dose is very important, but that if individuals do receive 10 milligrams per kilogram then they do have an efficacious response***.

227.    During the question and answer portion of the call, Defendants Sandrock and Budd-

Haeberlein responded to a question pertaining to the dosages of Aduhelm, stating:

> Q: Great, thanks for taking the question. I guess a follow-up and sort of second question from me. So first one is, you've been talking about exposure and dose a lot. Could you just broadly comment on how many of these patients actually achieved all the factors that you were looking for and how easily you think that will be the case in clinical practice. And I guess, the related question to that is, this dose exposure curve that you're sort of talking about [Sandrock]. I mean, were there characteristics that were different where the kinetics of the amyloid plaque reduction different in these subgroup of patients with the achievement of tau or amyloid reductions were they significantly different? I'm wondering what you think is sort of biologically happening to account for this steep dose exposure curve (inaudible)?

*Defendant Sandrock*: These are good questions Matthew and we're still learning as we look at the data, but I would say this, the – even in MCI patient, if you look at the amount of amyloid in the brain, it's tremendous. It took 20 years to build that much up and in the context of an 18-month trial, you have to remove a large amount of amyloid. I think that's what distinguishes aducanumab and BAN2401, is that we can – it's safe enough to achieve the doses that allow us to remove a large amount of amyloid. ***And if you don't remove a large amount, you're not going to get an effect.*** Also there is a lag. ***You remove amyloid, and then there is a little bit of a lag for the clinical effect***. We saw that in PRIME for example, where we did have some amyloid lowering at six months, but we saw no difference in the clinical outcomes at six months. It was – it took the 12-month time period to see – to start to see an effect on clinical outcomes.

***So, in addition to a large amount of amyloid removal, I think you need to have a little bit of time for that, for that biological activity to have an effect on clinical outcomes. That's what we see and I would say that if you look at the amyloid-PET results that was on one of the slides and those who had more than 10 doses of 10 milligrams, you can see that the SUVR score is very similar in ENGAGE in that subgroup of patients in ENGAGE to the EMERGE total dataset. So – and so again, what it says is that if you give enough of the high dose, you can achieve a certain amount of amyloid removal and that certain amount is what's required to see the reduction in clinical decline in an 18-month study.***

*Defendant Budd-Haeberlein*: Yes, [ ] just to add to that, on the question of numbers. On the graph that you've just referred to, you got the end numbers. So they were 147 for EMERGE and 116 for ENGAGE in that CDR-Sum of Boxes analysis. But the question you ask of how many patients have the precise criteria? Well there aren't precise criteria. Dose response is not binary. ***And so, given the levels of dose you have a different response and it's a bit of a sliding scale. So we have that exploratory analysis that we disclosed to explain what it is we learned around the importance of dose, but there is no perfect number of doses that are required, it's not binary***.

228.   Responding to a question regarding the difference in plaque reduction, Defendant

Budd-Haeberlein stated:

Q: Within the high dose arm in the ENGAGE study, can you talk about the magnitude of plaque reductions you observed in patients who titrated all the way up to the highest dose versus patients who were stopped at 6mg/kg and I guess, ***does the – does a differential magnitude of plaque reduction in those patients at all tell the same narrative you're seeing on the difference in clinical outcomes*** . . .

*Defendant Budd-Haeberlein*: So to your first question in amyloid plaque reduction, we do believe that PET measurement of amyloid plaque reduction is a very sensitive tool of dose and ***you've correctly identified that ENGAGE at the high dose is showing a lower reduction than in EMERGE and we do believe that that is a clear reflection of the lower doses that were achieved in that high-dosing group in ENGAGE***.

### October 23, 2019 MSNBC Interview

229.    On October 23, 2019, Defendant Vounatsos participated in an interview on MSNBC. During the interview, Defendant Vounatsos stated that a decrease in amyloid plaque "leads to" better clinical outcomes, stating:

Q: So [Aduhelm] is a monoclonal antibody that actually is designed to go after betaamyloid plaques which are seen in some Alzheimer's patients. You're telling me that it actually removes the plaques. ***There was some speculation that maybe that's not it; could be that you get Alzheimer's and the plaques then come about as a result of Alzheimer's, it's not an actual cause***. You're convinced beta-amyloid is the key to dealing with –

*Defendant Vounatsos*: More than ever. ***What we demonstrate is that [Aduhelm] who's binding to the right part of the amyloid-beta, the aggregated form of amyloidbeta, is able to erode and eliminate the plaque leading to the benefits we see in terms of cognition for the patients. It reduces basically the decline and we can see effects such as on memory orientation, language, but also functionally the ability to take care of oneself***.

### December 3, 2019 Credit Suisse Report

230.    On December 3, 2019, Credit Suisse published an analyst report pertaining to Aduhelm. Within the report, Defendant Sandrock was credited with mentioning that differences in plaque removal levels are the reason for the differing results in Study 301 and Study 302, with the report stating:

***As part of an explanation for the negative ENGAGE results, [Defendant] Sandrock indicated to us that the amyloid lowering effect in ENGAGE underperformed expectations. He believes that the effect may have been partly responsible for the confounding results (e.g. due to less target engagement)***. He also said that later enrollers had a different effect than early enrollers.

### December 5, 2019 Phase III Results Announcement

231.    On December 5, 2019, the Company announced its Phase III Topline results. In the

announcement, Defendant Budd-Haeberlein stated:

> To summarize, the aducanumab Phase III top line results. Following early
> termination based on futility, we analyzed a larger dataset. And this showed that in
> EMERGE, the high dose reduced clinical decline as measured by the primary and
> secondary endpoints. In ENGAGE, aducanumab did not reduce the clinical decline.
> ***In a post-hoc analysis, data from a subset of patients exposed to the high dose of
> aducanumab support the positive findings of EMERGE***.

> ***December 5, 2019 Investor Call***

232.    That same day, the Company held a call with investors to discuss the results. On

the call, Defendant Budd-Haeberlein stated:

> ***Today, though, we shared a new post hoc analysis, which is what we've called
> those – that subgroup of individuals who were able to have the opportunity for
> the intended dosing regimen, the so-called Protocol Version 4 group. And in that
> subset of patients, aducanumab did support the positive findings of EMERGE
> and ENGAGE***.

233.    Later on the call, during a question and answer portion, Defendants Sandrock and

Budd-Haeberlein explained the differing results of Study 301 and 302 by explaining that Study

302 was positive because more plaque was removed than Study 301:

> Q: Congrats on the presentation today. So I have a question on the amyloid
> reduction. How do you think about the amyloid reduction in both trials looking
> similar yet really yielding different results? And how does this square with your
> hypothesis that there was a sufficient difference in the trial with – in relation to the
> protocol amendment – to drive a divergent result?

> *Defendant Sandrock:* So I'll start. And I'm sure [Budd-Haeberlein] will have things
> to add. But I would point out that in the high – in the low-dose group, the reduction
> was similar between EMERGE and ENGAGE. But in the high-dose group, there
> was actually a difference. And in fact, [Budd-Haeberlein] pointed out the SUVR
> numbers. Even though the amyloid PET was done in a sub-study, it is such a precise
> measurement. If you look at the error bars, they're tiny, they almost blend right into
> the actual symbol. And so the small differences between – ***the difference between
> EMERGE and ENGAGE actually is significant. And I think [Budd-Haeberlein]
> pointed out this morning that in the EMERGE trial, the reduction was what we
> had expected based on the PRIME data. But ENGAGE fell short. And that's the
> reason why we started to focus on exposure because it looked like the amyloid***

*reduction in ENGAGE was not quite what we had expected. And that's what led us down this track of looking at drug exposure*.

*Defendant Budd-Haeberlein*: Yes, Nothing to add.

### January 30, 2020 Earnings Call

234.   On January 30, 2020, the Company hosted an earnings call with investors and analysts to discuss its financial results for the fourth quarter and full year of the 2019 Fiscal Year (the "FY 2019 Earnings Call"). On the FY 2019 earnings call, Defendant Sandrock stated, regarding Aduhelm:

> Final analysis of these data showed that EMERGE was a positive study with the high dose regimen of aducanumab achieving statistical significance on both the prespecified primary endpoint of CDR Sum of Boxes as well as on all three prespecified secondary endpoints.

> On the other hand data from the ENGAGE study did not meet the primary endpoint, *although we do believe that data from patients who achieve sufficient exposure to high dose aducanumab in ENGAGE support the findings of EMERGE*.

### April 2, 2020 Investor Call

235.   On April 2, 2020, the Company held another Phase III Topline results call with investors. On the call, Defendant Budd-Haeberlein stated:

> When we now look at these charts, the top is the pre PV4 population and the bottom is the post-PV4 population. We can see the impact of that protocol amendment. In the pre-PV4 patients, only 21% in EMERGE and 15% in ENGAGE actually had that dark blue, the full possible 14 doses of 10 milligram per kilogram, whereas post that protocol amendment, there is much less heterogeneity and a much larger proportion of subjects, 51% in EMERGE and 47% in ENGAGE, received those full profitable 14 doses.

> If we then look at the impact of the population who did have the opportunity to receive the full 14 doses, we should compare the original outcome for both studies, and here, I'm showing the primary endpoint CDR-Sum of boxes for both EMERGE and ENGAGE at Week 78, and you will recall that there was a 23% and a 2% difference in those two studies. And if we now look at the patients who had the opportunity for the full 14 doses, in EMERGE, they now have in the high dose a 30% difference versus placebo, and in ENGAGE, where we did not have an outcome in the overall analysis in the PV4 population, the high dose has a 27%

difference from placebo. ***And so in these populations a much more similar outcome can be observed***.

* * *

So with that, I would like to summarize the aducanumab Phase III top line results. Following study termination based on futility analysis of the larger data set showed that in EMERGE high dose aducanumab did reduce clinical decline as measured by both primary and secondary endpoints. In ENGAGE, however, aducanumab did not reduce clinical de[cline].

***In a post hoc analysis, data from subs[ets] of patients, the PV4 population who had the opportunity to be exposed to high dose did support the positive findings of EMERGE***. In sub-studies, aducanumab showed an effect on disease related biomarkers both in CSF and in PET imaging studies[.]

### July 22, 2020 Earnings Call

236.     On July 22, 2020, the Company hosted an earnings call with investors and analysts to discuss its financial results for the second quarter and full year of the 2020 Fiscal Year (the "2Q 2020 Earnings Call"). On the 2Q 2020 Earnings Call, Defendant Vounatsos stated:

This submission followed ongoing collaboration with the FDA and include data from a comprehensive clinical development program, including EMERGE, the first positive Phase III study ever in this space together ***with supporting data from the Phase III ENGAGE study*** and positive results from the Phase Ib PRIME study. Our data show that aducanumab may help to both reduce the decline of cognitive function and help patients' ability to perform certain activities of daily living, which for some patients may result in independence for a longer period of time.

237.     Later on the call, Defendant Sandrock discussed the differing results from the Phase III studies, expressing optimism nonetheless:

I think – look, the filing is based on these 3 studies, EMERGE, ENGAGE and PRIME. EMERGE is the first study to show an effect, not only on the primary endpoint, but all 3 prespecified secondary endpoints. ***We believe that data from ENGAGE – that portions of the data from ENGAGE, a negative study, that portions of it do support the analysis that we did with EMERGE***. And then I'll say in also PRIME, which was published, shows even though the clinical endpoints were exploratory endpoints, on the highest dose, there was an effect on MMSE as well as CDR sum of boxes. ***And again, very similar that the lower doses did not show much of an effect. So consistent with the findings from ENGAGE and***

70

*EMERGE, you really need to get to the higher dose. And I think our data are all consistent with that*.

\* \* \*

So we submitted all the data from those 3 studies that I mentioned: EMERGE, ENGAGE and PRIME. And what the FDA chooses to look at is – that's their purview. *We – I will say that in terms of the negative study, ENGAGE, we do – we have analyses that show that those who received the highest dose over a sustained period of time do show evidence of efficacy similar to what we found in EMERGE*. And so that's the data we presented to CTAD and AD/PD, and that's why we believe there's supportive evidence coming from ENGAGE.

### July 29, 2020 Alzheimer's Association Conference

238.    On July 29, 2020, the Company held a Topline Results Presentation at the Alzheimer's Association International Conference. During the presentation, Defendant Budd-Haeberlein stated:

> In the amyloid PET SUVR group, there was a statistically-significant dose and time dependent reduction versus placebo in both low and high-dose. In the CSF sub-study, there was a statistically-significant dose-dependent reduction in phospho-tau and a numerical difference versus placebo in the total tau.

> In ENGAGE, the primary and secondary endpoints were not met. There was a numerical difference versus placebo in the low-dose group. In the PET SUVR study, there was a dose and time dependent reduction versus placebo, which was statistically significant.

> However, this and the high dose was lower than that, which we've seen in EMERGE and we also understand that the median cumulative dose was lower in ENGAGE subgroup 126 milligram per kilogram versus the EMERGE subgroup at 140 milligram per kilogram.

> *To understand the difference between the studies and the impact of changing the protocol, we defined population by a randomized cohort, who had the opportunity for all 14 doses of 10 milligram per kilogram, and this is termed the post Protocol Version 4 or PV4 population*.

> *If we compare the ITT population with the post-PV4 population, we can see that the post PV4 population in ENGAGE is consistent with the overall ITT population in EMERGE*.

### September 19, 2020 Chinese National Conference of Neurology

239.    On September 19, 2020, the Company held a Topline Results Presentation at the 23rd Chinese National Conference of Neurology. During the presentation, Defendant Budd-Haeberlein stated:

> So to go back to the primary results and the primary endpoint for both EMERGE and ENGAGE, as I showed you earlier, CDR Sum of Boxes in the high dose group was 22% difference from placebo in EMERGE and a 2% difference in ENGAGE. If we now look at the post-PV4 population, we have a minus 30% effect in the postPV4 population in CDR Sum of Boxes in EMERGE and a minus 27% difference from placebo in the ENGAGE population. So essentially in EMERGE, the signal remains whereas in ENGAGE, there was no previous signal. However, when patients had the full opportunity for the 14 doses of 10 milligram per kilogram, we do identify a difference from placebo. And here are the line charts of those populations.
>
> ***So in summary, following study termination based on futility, there was an analysis of a larger data set. In EMERGE, the high dose aducanumab reduced clinical decline as measured by both the primary and secondary endpoints. In ENGAGE, aducanumab did not reduce the clinical decline. However, in a posthoc analysis, data from a subset of patients exposed to high dose aducanumab support the positive findings of EMERGE***. In sub-studies, aducanumab also showed an effect on disease-related biomarkers.

240.    The statements in ¶¶ 221-239 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Aduhelm studies conducted by the Company were both failures; (2) the Company reworked the data to make it seem as if the Aduhelm studies were successful; (3) the Company used improper means and connections with the FDA to get Aduhelm approved; (4) the Company was aware of the fact Aduhelm did not work as intended and any FDA approval would be the result of the Company's interference; and (5) the Company failed to maintain internal controls.

## THE TRUTH BEGINS TO EMERGE WHILE FALSE AND MISLEADING STATEMENTS CONTINUE

*November 4, 2020 Massie Report Draft*

241.    On November 4, 2020, in preparation for the advisory committee on November 6, the FDA published the briefing materials for the meeting. Among these materials was a joint 343-page report from the FDA and Biogen which included two appendices. The second of these appendices was the draft Massie Report.

242.    The Massie Report had a DRAFT watermark prominently displayed, likely a ploy by the FDA and Company to discredit the damning evidence held within.

243.    The Massie Report contained almost 100 pages worth of statistical analyses, organized by study as opposed to topic. While the Massie Report was too voluminous to analyze in the short period of time prior to the close of trading on November 5, a deeper review would reveal a number of important details to the Phase III trials.

244.    In short, the Massie Report revealed: (1) the drug had essentially no effect on non-APOE4 carriers; (2) the increase in doses as a result of Protocol Version 4 had no impact on the APOE4 carriers in Study 302; (3) APOE4 carriers whose titration was interrupted by ARIA experienced better clinical outcomes than those who titration was not interrupted and therefore received more 10 mg/kg doses *in both studies*; (4) the number of 10 mg/kg doses had no impact on APOE4 carriers in Study 302; (5) there was no correlation between the amount of plaque removed and the clinical outcomes; (6) there was a wide variation in treatment effect between countries an the United States performed poorly; (7) younger patients and those whose Alzheimer's was less advanced achieved worse outcomes; and (8) the multiple endpoints were closely correlated. In essence, the report launched significant, unanswerable critiques against any claims Biogen made in favor of Aduhelm's approval.

245.    On the day following this news, after investors began to digest and understand the information that had been made public, the Company's stock price fell $26.73 per share, or 7.5%,

from a close of $355.63 per share on November 4, 2020, to close at $328.90 per share on November 5, 2020.

### The November 6, 2020 Advisory Committee Vote

246.    Early on November 6, 2020, the advisory committee met to discuss whether to recommend Aduhelm for approval. The discussions were made public on Youtube, and continued until after trading closed for the day.

247.    In response to a question by the FDA regarding whether Study 302 could serve as primary evidence of effectiveness of Aduhelm for the treatment of Alzheimer's, with the explanatory analyses of Studies 301 and 302, as well as the results of Study 103 as supporting evidence, ten out of the eleven committee members voted no, with the sole remaining committee member voting as uncertain.

248.    In explaining why they did not vote to approve Aduhelm, most members pointed to the information contained in the Massie Report.

249.    One panelist, Dr. Caleb Alexander, cited his dissatisfaction as treating Study 302 as a positive study, stating:

> I think even with study 302 there are some reasons for question. One is that there's no correlation between plaque reduction and week 78 outcomes. . .
>
> Then the last that I'd say is that, once again as pointed out by the FDA's own [statistical] reviewer, there's no consistent effect across [APOE4] subgroups in 302, yet one would hope to see this with a strong efficacy signal.

250.    Another panelist, Dr. Aaron Kesselheim, objected on the same grounds, stating:

> I would have loved to see also a mediator analysis on whether the changes in plaque explain much of the differences in the cognitive endpoints, which is of course the burden of proof. The burden of proof is we targeted the oligomers of the amyloid hoping that that would have an impact clinically, and our question is does that bear up; if it's a strong enough effect? I must say I care more about the clinical aspects [i.e., clinical outcomes] than I do about the pathology.

251.    Yet another panelist, Dr. Joel Perlmutter, also objected on those grounds, stating:

I think we see a lack of correlation between the A-beta change and the clinical endpoint CDR-SB. I think that's a concern.

252.    Another panelist, Dr. Madhav Thambisetty, stated:

I would point to slide 20 of the FDA statistical reviewer's presentation, where you examine the relationship between change in global brain amyloid burden at week 78 in individuals exposed to high-dose aducanumab and change in the CDR sum of box scores. There really appears to be no relationship either in Study 302 or 301, and this appears to be the case even when the analysis is restricted to only individuals exposed to the 10mg/kg dose.

I think there are some larger implications of these findings which we are not tasked with discussing today. One of the larger questions relevant to these observations is whether lowering brain amyloid burden is in fact the correct target in Alzheimer's disease, but like I said, I think that's beyond the remit of the discussion today.

253.    In sum, one panelist, Dr. John Duda, stated:

But I think, all in all, the main -- I think several of us have said it already. Dr. Massie's criticisms just were never addressed in the clinical overview, and there seemed to be a disconnect between different aspects of the FDA reporting that are very difficult for us to draw conclusions from. So in light of that, I think it makes it much more difficult to get where the FDA maybe thought we would go today.

254.    Dr. Scott Emerson summed his thoughts up as:

I'm highly critical of the fact that the FDA presentation today was so heavily weighted to just giving the same conclusions that the sponsor did, and that there was no[] presentation by the statistician who'd done a careful analysis and made many points that I was very glad to see that the committee read.

255.    Dr. Kesselheim's summation was:

I also wanted to echo what others have said, to thank the FDA, and the sponsor, and Dr. Massie in particular, for their thorough reviews of the material and very helpful presentations.

256.    And lastly, Dr. Thambisetty stated:

I voted no as well for all of the reasons discussed throughout the day, and I'd also like to take the opportunity to thank both the applicant and the FDA for the privilege of reviewing this hugely important work. I'd also add a special note of thanks to

Dr. Tristan Massie for a really thorough statistical analysis that was very, very useful.

257.    On this news, the Company's stock price fell $92.64 per share, or 28.2%, from a close of $328.90 per share on November 5, 2020, to close at $236.26 per share on November 9, 2020. Despite this, the Individual Defendants continued to obfuscate the truth about the Company's reworking of the Phase III trial results and dealings with the FDA.

### February 3, 2021 Earnings Call

258.    On February 3, 2021, the Company hosted a call with investors and analysts to discuss the financial results for the fourth quarter and full year of the 2020 Fiscal Year (the "FY 2020 Earnings Call"). On the FY 2020 Earnings Call, Defendant Vounatsos spoke optimistically of Aduhelm's odds of getting approved by the FDA, despite the outcome of the advisory committee meeting, stating "[w]e remain ready to launch [Aduhelm] in the U.S., if and when it is approved."

259.    Defendant Vounatsos went on to further discuss the preparation the Company has been doing to determine the price of Aduhelm once approved:

Concerning price, we are getting there. We had very large engagements with many stakeholders. And basically, there are 2 main dimensions. The first one is the clinical meaningfulness and potentially in terms of cognitive functions, but also functional aspects on activity of daily living. This is one side of the equation.

The second one is the cost of Alzheimer's to society, which is nowadays more than $550 billion a year in the U.S. The cost for caring for patients, and if I'm not mistaken, it's more than $0.5 million. By the age of 80, 75% of the patients are in nursing home and this costs more than $100,000 a year. And these are the main elements that we consider in our wide engagement on the important topic of price. We are getting there, as I said, but too early to give more specifics.

### March 1, 2021 Cowen Conference

260.    On March 1, 2021, Defendant Vounatsos participated in an annual conference for the healthcare sector held by investment bank Cowen. During the conference, Defendant Vounatsos again spread optimism surrounding whether he felt Aduhelm would gain FDA

approval, not disclosing the nature of the Company's dealings with the FDA and Dunn, stating

that "Biogen is ready to launch [Aduhelm]."

261.    In discussing any potential commercialization hurdles and risks, Defendant

Vounatsos also revealed that the Company had set a price for the drug, stating:

> And we are set with price. We are ready and following a very thorough work done
> by the team, and we are working to ensure potentially an equitable launch so that
> we can take care of the underserved populations and learn from the COVID crisis.
> So Biogen is ready.

262.    In explaining how they settled on a price, Defendant Vounatsos stated:

> So the price, the team has done a very thorough work on assessing, potentially, the
> value for [Aduhelm] by looking at the clinical meaningfulness based on our data,
> but also the burden to the society in terms of cost, nowadays, assessing the U.S.
> more than [USD 850 billion] a year in terms of direct and indirect costs. But in
> addition, we know that 75% of the patients affected at the age of 50 -- at the age of
> 80 have to be institutionalized. And it costs more than $100,000 a year to keep those
> patients in institutions, in addition to the emotional impact it has on the caregivers,
> on the family. So it's a societal, I would say, issue. And these are key consideration
> in order to assess the value. The market is extremely large.
>
> Based on the entry criteria of our Phase III studies, it's more than 10 million patients
> in the U.S. only. Obviously, it doesn't mean that all the patients qualify, it doesn't
> mean that all the patients are known from the healthcare system. Some of them are
> not known. So the epidemiology is absolutely tremendous. It's a multi-billion dollar
> opportunity, certainly, for the company. But again, more importantly, we are
> talking about the value in terms of cognition and function to the patients directly,
> to the caregivers also.

### June 8, 2021 Investor Call

263.    On June 7, 2021, as the result of the Company's dealings with Dunn and the FDA,

the FDA announced that Aduhelm received an accelerated approval to begin commercial sales of

Aduhelm in the United States.

264.    The following day, the Company held a conference call with investors and analysts

to discuss the FDA approval (the "June 8, 2021 Approval Call"). During the June 8, 2021 Approval

Call, the Individual Defendants announced the Company's next task, getting Aduhelm approved

for Medicare reimbursement. During the June 8, 2021 Approval Call, Defendant Vounatsos stated

that Medicare coverage was "automatically presume" upon FDA approval:

> The vast majority of Alzheimer's patients in the U.S. are 65 or older. And as a result, most of our patients are expected to be covered by Medicare, either through fee-for-service or Medicare Advantage. ***For Medicare fee-for-service, coverage is automatically presumed with FDA approval. We expect most Medicare Advantage plans to define their medical policies within the first several months after launch***. Biogen is committed to an equitable launch with a goal of maximizing access for all patients with early stage Alzheimer's disease, including the underserved population with can be disproportionately impacted.

265.    Later on the call, Defendant Alaimo doubled down on Defendant Vounatsos's

statements, saying:

> Prior to launch, ***our teams have been working closely with both commercial and government payers***. And what I can tell you is that our commercial teams will be discussing patients consistent with those studied in ADUHELM's clinical development program with their customers. Now we've already talked about the majority of patients being on Medicare. ***And for Medicare fee-for-service, coverage is automatically presumed with FDA approval, and we expect most Medicare Advantage and commercial plans to define their medical policies, which is in reference to your question, within the first several months after launch***.

***July 22, 2021 Earnings Call***

266.    On July 22, 2021, the Company held a call with investors and analysts to discuss

the financial results for the second quarter of the 2021 Fiscal year (the "Q2 2021 Earnings Call").

On the call, Defendant Vounatsos offered his insight into the potential CMS reimbursement in the

wake of the recent announcement that CMS would be initiating a NCD for Aduhelm, stating:

> In terms of reimbursement, it is still the early days. And I am pleased to say that we have seen the first examples of Medicare Advantage plans approving pre-authorization. We welcome the recent opening of the National Coverage Determination analysis by CMS for monoclonal antibodies targeting amyloid-beta, including ADUHELM. We believe this process will provide additional clarity on coverage for Medicare beneficiaries and drive consistency of access across the country. We expect that regional Medicare Administrative Contractors and Medicare Advantage plans will provide coverage for ADUHELM while the NCD analysis is underway. We believe that CMS's swift decision to initiate the NCD

analysis is a testament to the large unmet need in Alzheimer's disease and the urgency to clarify access for patients.

267.    Defendant Vounatsos also stated that the Company "expect[s] that regional Medicare Administrative Contractors and Medicare Advantage plans will provide coverage for Aduhelm while the NCD analysis was underway."

268.    In response to a question by a Jeffries analyst pertaining to the progress of treating patients one month after the FDA approval, Defendant Alaimo proclaimed:

> You might have seen recently published several AD specialists recently said, building this infrastructure for the appropriate use of ADUHELM will require time, resources, and some creative planning. In fact, I recently just visited several sites, and what I saw, is consistent with what we're seeing across the entire country. Sites are currently, right now, developing their protocols. They are reengaging with their patients. They are considering or scheduling amyloid-beta confirmation. They also are ordering baseline MRIs. Then, they are discussing these results of the tests and making the treatment decision with their patients. This has clearly taken quite a bit of time. On our last call with you, we shared a program that we created with Labcorp and Mayo Clinic Labs to help physicians and patients access CSF diagnostic laboratory testing. We are also seeing a very strong interest in this program. In fact, we've already seen the first orders come in for both of our lab partners. Sites are also trying to gain clarity, as you said, on the reimbursement pathway. The decision by CMS to open an NCD analysis will help provide additional clarity to sites and healthcare.

269.    In describing the reimbursement status of Aduhelm later in the call, Defendant Alaimo stated:

> Now, while this analysis is underway, coverage decisions will be made by Regional Medicare Administrative Contractors, as you know is the MACs, and the Medicare Advantage plan. Based on precedent, we expect the MAC s and Medicare Advantage plans will provide coverage for ADUHELM. Now, while NCD for drugs are rare, and the only recent example of a drug NCD analysis, which was CAR-T, both MACs and Medicare Advantage plans continued to cover these -- this product during the NCA process.
>
> We can also confirm that some Medicare Advantage plans have already approved prior authorizations for ADUHELM. For the MACs, due to the miscellaneous coding, it does take them a little bit of time to process the claims, but we are also aware that MACs have received claims already. So during the NCD analysis, we are actively working with sites to support patient access and reimbursement. Keep

in mind, and as I witnessed across the various sites that I visited, each site will operationalize at different rates, which is why patient infusions will build gradually over the year as we've referenced. Though this process will take time, it was absolutely humbling to see how much effort and passion these physicians are putting into building the infrastructure to treat their patients and I'm really proud of how hard our teams are working to support these sites as they break new ground.

270.    The statements referenced in ¶¶258-269 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Biogen's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose, *inter alia*, that: (1) the Aduhelm studies conducted by the Company were both failures; (2) the Company reworked the data to make it seem as if the Aduhelm studies were successful; (3) the Company used improper means and connections with the FDA to get Aduhelm approved; (4) the Company was aware of the fact Aduhelm did not work as intended and the FDA approval was the result of the Company's interference; (5) FDA approval does not automatically mean a drug will receive approval for Medicare; (6) the Company was aware that Aduhelm would have a difficult time receiving Medicare approval; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## **THE TRUTH FULLY EMERGES**

271.    On January 11, 2021, after the stock market closed, CMS announced its draft decision on whether Aduhelm will receive Medicare reimbursement. In the decision, CMS proposed that Medicare would only reimburse Aduhelm patients under "Coverage with Evidence Development. In essence, CMS was limiting reimbursement only to patients who were enrolled in a clinical trial.

272.     The decision further limited reimbursement to only those patients who have mild forms of cognitive impairment or mild dementia, and those who already have amyloid plaques. The reimbursement would also be limited solely to clinical trials that take place in a hospital-based outpatient setting.

273.     This was damning for Aduhelm, as the reimbursement would only be offered to a small percentage of the patient population, made even smaller with many hospitals refusing to provide patients with any Aduhelm at all, making possible locations for clinical trials severely limited. Even worse, many insurance providers often follow guidance of CMS in their own coverage decisions, meaning that Aduhelm would face an uphill battle getting any insurance coverage, let alone Medicare coverage.

274.     On this news, the Company's stock price fell $16.18 per share, or 6.7%, from a close of $241.52 per share on January 11, 2022, to close at $225.34 per share on January 12, 2022.

### REPURCHASES DURING THE RELEVANT PERIOD

275.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***approximately $10.6 billion*** to repurchase approximately 36,130,249 shares of its own common stock at artificially inflated prices between October 2019 and September 2021.

276.     According to the annual report the Company filed with the SEC on Form 10-K on February 6, 2020 (the "2020 10-K"), between October 1, 2019 and October 31, 2019, the Company repurchased 3,215,407 shares of its own common stock at an average price of approximately $238.71, for a total cost to the Company of approximately $767,549,805.

277.     As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $42,989,992 for repurchases of its own stock between October 1, 2019 and October 31, 2019.

278.     According to the 2020 10-K, between November 1, 2019 and November 30, 2019, the Company repurchased 1,550,825 shares of its own common stock at an average price of approximately $292.01, for a total cost to the Company of approximately $452,856,408.

279.     As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $103,393,503 for repurchases of its own stock between November 1, 2019 and November 30, 2019.

280.     According to the 2020 10-K, between December 1, 2019 and December 31, 2019, the Company repurchased 2,928,634 shares of its own common stock at an average price of approximately $297.99, for a total cost to the Company of approximately $872,703,646.

281.     As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $212,765,260 for repurchases of its own stock between December 1, 2019 and December 31, 2019.

282.     According to the quarterly report filed by the Company with the SEC on Form 10-Q  on April 23, 2020 (the "Q1 2020 10-Q"), between January 1, 2020 and January 31, 2020, the Company repurchased 97,807 shares of its own common stock at an average price of approximately $297.49, for a total cost to the Company of approximately $29,096,604.

283.     As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $7,056,775 for repurchases of its own stock between January 1, 2020 and January 31, 2020.

284.    According to the Q1 2020 10-Q, between February 1, 2020 and February 29, 2020, the Company repurchased 975,000 shares of its own common stock at an average price of approximately $331.24, for a total cost to the Company of approximately $322,959,000.

285.    As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $103,252,500 for repurchases of its own stock between February 1, 2020 and February 29, 2020.

286.    According to the Q1 2020 10-Q, between March 1, 2020 and March 31, 2020, the Company repurchased 6,248,925 shares of its own common stock at an average price of approximately $298.95, for a total cost to the Company of approximately $1,868,116,129.

287.    As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $459,983,369 for repurchases of its own stock between March 1, 2020 and March 31, 2020.

288.    According to the quarterly report filed by the Company with the SEC on Form 10-Q on July 22, 2020 (the "Q2 2020 10-Q"), between April 1, 2020 and April 30, 2020, the Company repurchased 5,675,000 shares of its own common stock at an average price of approximately $314.05, for a total cost to the Company of approximately $1,782,233,750.

289.    As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $503,429,250 for repurchases of its own stock between April 1, 2020 and April 30, 2020.

290.    According to the Q2 2020 10-Q, between May 1, 2020 and May 31, 2020, the Company repurchased 3,306,307 shares of its own common stock at an average price of approximately $310.52, for a total cost to the Company of approximately $1,026,674,450.

291.    As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $281,631,230 for repurchases of its own stock between May 1, 2020 and May 31, 2020.

292.    According to the quarterly report filed by the Company with the SEC on Form 10-Q on October 21, 2020 (the "Q3 2020 10-Q"), between August 1, 2020 and August 31, 2020, the Company repurchased 2,025,000 shares of its own common stock at an average price of approximately $283.69, for a total cost to the Company of approximately $574,472,250.

293.    As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $118,158,750 for repurchases of its own stock between August 1, 2020 and August 31, 2020.

294.    According to the Q3 2020 10-Q, between September 1, 2020 and September 30, 2020, the Company repurchased 2,458,413 shares of its own common stock at an average price of approximately $274.78, for a total cost to the Company of approximately $675,522,724.

295.    As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $121,543,939 for repurchases of its own stock between September 1, 2020 and September 30, 2020.

296.    According to the annual report filed by the Company with the SEC on Form 10-K on February 3, 2021 (the "2020 10-K"), between December 1, 2020 and December 31, 2020, the Company repurchased 1,620,969 shares of its own common stock at an average price of approximately $246.77, for a total cost to the Company of approximately $400,006,520.

297.    As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $34,737,366 for repurchases of its own stock between December 1, 2020 and December 31, 2020.

298.    According to the quarterly report filed by the Company with the SEC on Form 10-Q on April 22, 2021 (the "Q1 2021 10-Q"), between February 1, 2021 and February 28, 2021, the Company repurchased 675,000 shares of its own common stock at an average price of approximately $279.13, for a total cost to the Company of approximately $188,412,750.

299.    As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $36,308,250 for repurchases of its own stock between February 1, 2021 and February 28, 2021.

300.    According to the Q1 2021 10-Q, between March 1, 2021 and March 31, 2021, the Company repurchased 1,532,874 shares of its own common stock at an average price of approximately $268.51, for a total cost to the Company of approximately $411,591,998.

301.    As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $66,174,171 for repurchases of its own stock between March 1, 2021 and March 31, 2021.

302.    According to the quarterly report filed by the Company with the SEC on Form 10-Q on July 22, 2021, between May 1, 2021 and May 31, 2021, the Company repurchased 1,620,858 shares of its own common stock at an average price of approximately $277.63, for a total cost to the Company of approximately $449,998,807.

303.    As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $84,754,665 for repurchases of its own stock between May 1, 2021 and May 31, 2021.

304.    According to the quarterly report filed by the Company with the SEC on Form 10-Q on October 20, 2021 (the "Q3 2021 10-Q"), between August 1, 2021 and August 31, 2021, the

Company repurchased 2,100,000 shares of its own common stock at an average price of approximately $340.89, for a total cost to the Company of approximately $715,869,000.

305.     As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $242,655,000 for repurchases of its own stock between August 1, 2021 and August 31, 2021.

306.     According to the Q3 2021 10-Q, between September 1, 2021 and September 30, 2021, the Company repurchased 99,230 shares of its own common stock at an average price of approximately $344.06, for a total cost to the Company of approximately $34,141,074.

307.     As the Company's stock was actually worth only $225.34 per share, the price at closing on January 12, 2022, the Company overpaid by approximately $11,780,586 for repurchases of its own stock between September 1, 2021 and September 30, 2021.

308.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by ***$2,430,614,606***.

## DAMAGES TO BIOGEN

309.     As a direct and proximate result of the Individual Defendants' conduct, Biogen has lost and expended, and will lose and expend, many millions of dollars.

310.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company; its President; former CEO; former CMO and EVP of Research and Development; and its former SVP – Head of Neurodegeneration Development Unit, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

311.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the

Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

312.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

313.    Such expenditures include the $2.4 billion that the Individual Defendants caused the Company to overpay for repurchases of its own stock while the stock price was artificially inflated as a result of the false and misleading statements alleged herein.

314.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

315.    As a direct and proximate result of the Individual Defendants' conduct, Biogen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## **DERIVATIVE ALLEGATIONS**

316.    Plaintiff brings this action derivatively and for the benefit of Biogen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Biogen, waste of corporate assets, unjust enrichment, abuse of control, and violations of Sections 10(b), 20(a), and 21D of the Exchange Act, as well as the aiding and abetting thereof.

317.    Biogen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

318.    Plaintiff has been a shareholder of Biogen stock in one brokerage account since at least 2020, which stock was transferred from another brokerage account where it was held since at least 2019.. Plaintiff will adequately and fairly represent the interests of Biogen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

319.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

320.    A pre-suit demand on the Board of Biogen is futile and, therefore, excused. At the time of filing this action, the Board consists of the following ten individuals: Defendants Dorsa, Hawkins, Mantas, Rowinsky, and Sherwin (the "Director-Defendants"), and non-parties Maria C. Freire, Susan Langer, Monish Patolawala, Christopher A. Viehbacher, and Lloyd B. Minor (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was commenced.

321.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Additionally, the Director-Defendants intentionally or recklessly approved of the unnecessary and harmful repurchases that caused the Company to overpay by ***over***

**$2.4 billion** for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

322.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

323.    The Director-Defendants knew of the falsity of the misleading statements at the time they were made. Risk management and compliance protocols, especially regarding revenue projections, accounting procedures, and financial reporting, are an integral part of the Company's business. As an entity operating in a federally regulated industry, maintaining adequate risk management and compliance procedures lie at the core operations of Biogen. The maintenance of risk management and compliance procedures was highly material to the Company's core operations, as evidenced by numerous references in the Company's public filings and press releases issued during the Relevant Period.

324.    Additional reasons that demand on Defendant Dorsa is futile follow. Defendant Dorsa has served as a Company director since January 2010. She has also served as the Chair of

the Board since the 2023 Annual Meeting, serves as the chair of the Corporate Governance Committee, and was determined by the Board to be an audit committee financial expert. As discussed above, the Company provides Defendant Dorsa with handsome compensation. As a trusted long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Dorsa breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

325.    Additional reasons that demand on Defendant Hawkins is futile follow. Defendant Hawkins has served as a Company director since June 2019. Defendant Hawkins also serves as the Chair of the Audit Committee and as a member of the Corporate Governance Committee. As discussed above, the Company provides Defendant Hawkins with handsome compensation. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Hawkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

326.    Additional reasons that demand on Defendant Mantas is futile follow. Defendant Mantas has served as a Company director since June 2019. Defendant Mantas also serves as the Chair of the Compensation and Management Development Committee and as a member of the Audit Committee. As discussed above, the Company provides Defendant Mantas with handsome

compensation. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Mantas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

327.    Additional reasons that demand on Defendant Rowinsky is futile follow. Defendant Rowinsky has served as a Company director since March 2010. Defendant Rowinsky also serves as a member of the Compensation and Management Development Committee and Corporate Governance Committee. As discussed above, the Company provides Defendant Rowinsky with handsome compensation. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Rowinsky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

328.    Additional reasons that demand on Defendant Sherwin is futile follow. Defendant Sherwin has served as a Company director since March 2010. Defendant Sherwin is also a member of the Audit Committee. As discussed above, the Company provides Defendant Sherwin with handsome compensation. As a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too,

Defendant Sherwin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

329. Additional reasons that demand on the Board is futile follow.

330. Defendants Hawkins (as Chair), Mantas, and Sherwin (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

331. In violation of the Code of Business Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, violations of the Exchange Act, and aiding and abetting thereof. In violation of the Code of Business Conduct, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report

violations of the Code of Business Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

332.    Biogen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Biogen any part of the damages Biogen suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

333.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

334.    The acts complained of herein constitute violations of fiduciary duties owed by Biogen's officers and directors, and these acts are incapable of ratification.

335.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Biogen. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-

versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Biogen, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

336.    If there is no directors' and officers' liability insurance, then the Directors will not cause Biogen to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

337.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

338.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

339.    The Individual Defendants, by virtue of their positions with Biogen and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Biogen and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Biogen to engage in the illegal conduct and practices complained of herein.

340.    Plaintiff on behalf of Biogen has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

341.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

342.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Biogen. Not only is Biogen now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Biogen by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *36,130,249* of its own shares at artificially inflated prices, damaging Biogen.

343.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

344.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Biogen not misleading.

345.    The Individual Defendants as top executives and directors acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless

disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

346.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

347.    Plaintiff, on behalf of Biogen, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

348.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Biogen's business and affairs.

349.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

350.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Biogen.

351.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

352.    In further breach of their fiduciary duties owed to Biogen, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Aduhelm studies conducted by the Company were both failures; (2) the Company reworked the data to make

it seem as if the Aduhelm studies were successful; (3) the Company used improper means and connections with the FDA to get Aduhelm approved; (4) the Company was aware of the fact Aduhelm did not work as intended and the FDA approval was the result of the Company's interference; (5) FDA approval does not automatically mean a drug will receive approval for Medicare; (6) the Company was aware that Aduhelm would have a difficult time receiving Medicare approval; and (7) the Company failed to maintain internal controls.

353. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

354. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

355. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

356. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for

the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

357.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

358.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Biogen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

359.    Plaintiff on behalf of Biogen has no adequate remedy at law.

<u>**FOURTH CLAIM**</u>
**Against the Individual Defendants for Abuse of Control**

360.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

361.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Biogen, for which they are legally responsible.

362.    As a direct and proximate result of the Individual Defendants' abuse of control, Biogen has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

363.    Plaintiff on behalf of Biogen has no adequate remedy at law.

<u>**FIFTH CLAIM**</u>
**Against the Individual Defendants for Unjust Enrichment**

364.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

365.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Biogen.

366.    The Individual Defendants either benefitted financially from the improper conduct or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

367.    Plaintiff, as a shareholder and a representative of Biogen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

368.    Plaintiff on behalf of Biogen has no adequate remedy at law.

### SIXTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

369.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

370.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Biogen in a manner consistent with the operations of a publicly held corporation.

371.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Biogen has sustained and will continue to sustain significant damages.

372.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

373.    Plaintiff on behalf of Biogen has no adequate remedy at law.

## SEVENTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

374.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

375.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

376.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

377.    Plaintiff on behalf of Biogen has no adequate remedy at law.

## EIGHTH CLAIM
### Against Defendants Vounatsos, Alaimo, Sandrock, and Budd-Haeberlein for Contribution Under Sections 10(b) and 21D of the Exchange Act

378.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

379.    Biogen, along with Defendants Vounatsos, Alaimo, Sandrock, and Budd-Haeberlein, are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Vounatsos, Alaimo, Sandrock, and Budd-Haeberlein's willful and/or reckless violations of their obligations as officers and/or director of Biogen.

380.    Defendants Vounatsos, Alaimo, Sandrock, and Budd-Haeberlein, because of their positions of control and authority as officers and/or director of Biogen, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Biogen, including the wrongful acts complained of herein and in the Securities Class Actions.

381.    Accordingly, Defendants Vounatsos, Alaimo, Sandrock, and Budd-Haeberlein are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

382.    As such, Biogen is entitled to receive all appropriate contribution or indemnification from Defendants Vounatsos, Alaimo, Sandrock, and Budd-Haeberlein.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Biogen, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Biogen;

(c)    Determining and awarding to Biogen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Biogen and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Biogen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following

resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

       1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

       2. a provision to permit the shareholders of Biogen to nominate at least four candidates for election to the Board; and

       3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

       (e)     Awarding Biogen restitution from the Individual Defendants, and each of them;

       (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: October 15, 2024

                          Respectfully submitted,

                          **THE BROWN LAW FIRM, P.C.**

                          */s/ John Coyle*
                          John Coyle (BBO # 714121)
                          Timothy Brown
                          767 Third Avenue, Suite 2501
                          New York, NY 10017
                          Telephone: (516) 922-5427

Facsimile: (516) 344-6204
Email: jcoyle@thebrownlawfirm.net
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Jonathan Blaufarb, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15 ___ day of October, 2024.

Signed by:

*Jonathan Blaufarb*

038365E245DC4F8...

Jonathan Blaufarb